Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
October 29, 2018

2018 CO 85

**No. 16SC906, <u>In re Marriage of Rooks</u>— Divorce—Assisted Reproduction—Embryos.**

In this dissolution of marriage proceeding, the supreme court reviews how courts should resolve disagreements over the disposition of a couple's cryogenically preserved pre-embryos when that couple divorces. The supreme court holds that because the underlying interests at stake are the equivalently important, yet competing, right to procreate and right to avoid procreation, courts should strive, where possible, to honor both parties' interests in procreational autonomy. Thus, courts should look first to any existing agreement expressing the spouses' intent regarding disposition of the couple's remaining pre-embryos in the event of divorce. In the absence of such an agreement, courts should seek to balance the parties' respective interests in receipt of the pre-embryos. In balancing those interests, courts should consider the intended use of the party seeking to preserve the pre-embryos; a party's demonstrated ability, or inability, to become a genetic parent through means other than use of the disputed pre-embryos; the parties' reasons for undertaking in vitro fertilization in the first place; the emotional, financial, or logistical hardship for the person seeking to avoid becoming a genetic parent; any demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the

divorce process; and other considerations relevant to the parties' specific situation. However, courts should not consider whether the party seeking to become a genetic parent using the pre-embryos can afford a child. Nor shall the sheer number of a party's existing children, standing alone, be a reason to preclude preservation or use of the pre-embryos. Finally, courts should not consider whether the party seeking to become a genetic parent using the pre-embryos could instead adopt a child or otherwise parent non-biological children. The court reverses the judgment of the court of appeals and remands with directions to return the matter to the trial court to apply the announced balancing framework.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2018 CO 85**

**Supreme Court Case No. 16SC906**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA990

**In re the Marriage of**

**Petitioner:**

Mandy Rooks,

and

**Respondent:**

Drake Rooks.

**Judgment Reversed**
*en banc*
October 29, 2018

**Attorneys for Petitioner:**
Azizpour Donnelly, LLC
Katayoun A. Donnelly
        *Denver, Colorado*

**Attorneys for Respondent:**
James W. Giese, P.C.
James W. Giese
Cheryl J. Lee
        *Grand Junction, Colorado*

**Attorneys for Amicus Curiae Academy of Adoption and Assisted Reproduction Attorneys:**
Sherman & Howard L.L.C.
Christopher M. Jackson
Rajesh Kukreja
        *Denver, Colorado*

Grob & Eirich, LLC
Seth Grob
 *Lakewood, Colorado*

**Attorneys for Amicus Curiae American Association of Pro-Life Obstetricians and Gynecologists:**
Thomas More Society
Thomas Olp
Rita Louise Lowery Gitchell
 *Chicago, Illinois*

Messall Law Firm, LLC
Rebecca Messall
 *Englewood, Colorado*

**Attorneys for Amicus Curiae Colorado Chapter of the American Academy of Matrimonial Lawyers:**
David M. Johnson
 *Colorado Springs, Colorado*

Willoughby & Associates
Kim Willoughby
 *Denver, Colorado*

**Attorneys for Amicus Curiae The Colorado Women's Bar Association:**
Brownstein Hyatt Farber Schreck, LLP
Carrie E. Johnson
Amanda K. Houseal
 *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**JUSTICE HOOD** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE SAMOUR** join in the dissent.

¶1     In vitro fertilization ("IVF") has given individuals and couples who are unable to conceive conventionally the opportunity to have genetic children. IVF technology permits the pre-embryos created through this process to be cryogenically frozen and later implanted in the carrier's uterus to be brought to term. IVF thus allows individuals and couples to delay childbearing while preserving the pre-embryos and the possibility of future children. However, when married couples turn to this technology and later divorce, IVF can present a host of legal dilemmas, including how to resolve disagreements over the disposition of cryogenically preserved pre-embryos that remain at the time of dissolution.

¶2     Here, a written agreement with the fertility clinic signed by Ms. Mandy Rooks and Mr. Drake Rooks fails to specify what should be done with their remaining pre-embryos in the event of divorce. Instead, per their agreement, the couple has turned to the dissolution court to resolve their dispute. Ms. Rooks wishes to keep the couple's pre-embryos to use them to become pregnant. Mr. Rooks does not want to have genetic children using the pre-embryos and wishes to have them discarded.

¶3     We are asked to decide how a court should determine, in dissolution of marriage proceedings, which spouse should receive remaining cryogenically preserved pre-embryos produced by the couple during their marriage.[1]    Although this case

---

[1] We granted certiorari to review the following issues:

fundamentally concerns the disposition of a couple's marital property, it presents difficult issues of procreational autonomy for which there are no easy answers because it pits one spouse's right to procreate directly against the other spouse's equivalently important right to avoid procreation, and because the fundamental liberty and privacy interests at stake are deeply personal and emotionally charged. And although Colorado statutes touch on some aspects of assisted reproduction, they do not address what should happen with a couple's cryogenically preserved pre-embryos when the couple divorces. Thus, in the absence of specific legislative guidance in these circumstances, we adopt an approach that seeks to balance the parties' interests given the legislature's general command in dissolution proceedings requiring the court to divide the marital property equitably.

¶4 Considering the nature and equivalency of the underlying liberty and privacy interests at stake, a court presiding over dissolution proceedings should strive, where possible, to honor both parties' interests in procreational autonomy when resolving

---

1. Whether, in the absence of an agreement between the parties, the court of appeals erred in its adoption of the balancing of interests approach to determine the disposition of the parties' cryogenically frozen pre-embryos in a dissolution of marriage.

2. Whether the court of appeals erred in applying an abuse of discretion standard of review in reviewing the trial court's determination of the disposition of a couple's cryogenically frozen pre-embryos in a dissolution of marriage.

4

disputes over a couple's cryogenically preserved pre-embryos. Thus, we hold that a court should look first to any existing agreement expressing the spouses' intent regarding disposition of the couple's remaining pre-embryos in the event of divorce. In the absence of such an agreement, a court should seek to balance the parties' interests when awarding the pre-embryos. In so doing, a court should consider (1) the intended use of the pre-embryos by the spouse who wants to preserve them (for example, whether the spouse wants to use the pre-embryos to become a genetic parent him- or herself, or instead wants to donate them); (2) the demonstrated physical ability (or inability) of the spouse seeking to implant the pre-embryos to have biological children through other means; (3) the parties' original reasons for undertaking IVF (for example, whether the couple sought to preserve a spouse's future ability to bear children in the face of fertility-implicating medical treatment); (4) the hardship for the spouse seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations; (5) a spouse's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce proceedings; and (6) other considerations relevant to the parties' specific situation. However, a court should not consider whether the spouse seeking to use the pre-embryos to become a genetic parent can afford a child. Nor shall the sheer number of a party's existing children, standing alone, be a reason to preclude implantation of the pre-embryos. Finally, a court should not consider whether the spouse seeking to use the pre-embryos to become a genetic parent could instead adopt a child or otherwise parent non-biological children.

5

¶5    Here, the parties' written agreement does not squarely resolve how remaining cryogenically preserved pre-embryos should be allocated in the event of divorce, and thus, for purposes of this dissolution proceeding, the disposition of these remaining pre-embryos must be resolved by balancing the parties' interests. Because the trial court and court of appeals considered certain inappropriate factors in attempting to balance the parties' interests here, we reverse the judgment of the court of appeals and remand the case with directions to return the matter to the trial court to balance the parties' interests under the framework we adopt today.

## I. Facts and Procedural History

¶6    Petitioner Ms. Mandy Rooks and Respondent Mr. Drake Rooks married in 2002. They separated in August 2014, and Mr. Rooks filed a petition for dissolution of marriage the following month. When the trial court entered its final orders in the dissolution proceedings in 2015, Mr. and Ms. Rooks had three children, and Ms. Rooks was not pregnant.

¶7    Mr. and Ms. Rooks used IVF to have their three children. In 2011, and again in 2013, they entered into agreements with the Colorado Center for Reproductive Medicine ("CCRM") and Fertility Laboratories of Colorado ("FLC") for the IVF services. The agreements identify Ms. Rooks as the "Female Patient" and Mr. Rooks as the "Spouse/Partner." These agreements provide information about the IVF and cryopreservation process.

¶8 IVF is a procedure that helps those facing fertility issues to become pregnant. The technique involves several steps: (1) developing eggs in the contributor's ovaries using hormones to stimulate ovulation, (2) removing the eggs from the contributor's ovaries, (3) placing the eggs and sperm together in a laboratory to allow fertilization to occur, and (4) transferring fertilized pre-embryos into the carrier's uterus.

¶9 As described in the agreements with CCRM and FLC, the purpose of cryopreservation is to preserve excess pre-embryos produced in an IVF treatment cycle in order to (1) reduce the risks of multiple gestation, (2) preserve fertility potential in the face of certain medical procedures, and (3) minimize the medical risk and cost to the patient by decreasing the number of hormone stimulation cycles and egg retrievals.

¶10 According to the agreements, pre-embryos are frozen on day 1, 2, 3, 5, or 6 after fertilization. The pre-embryos frozen on day 1 are at the pronuclear stage, when the single cell zygote has two nuclei. Pre-embryos frozen on day 2 or day 3 are at the multicellular stage, when the pre-embryo has four to eight cells. In most cases, pre-embryos are frozen on day 5 or 6 at the blastocyst stage, when the pre-embryo has eighty or more cells, an inner fluid-filled cavity, and a small cluster of inner cells. The FLC embryologists transfer the pre-embryos to a special solution where they are cooled to -35° C in a machine designed to control the rate of freezing. The pre-embryos are then plunged directly into liquid nitrogen at -196° C (-321° F). Finally, the frozen pre-embryos are transferred to storage containers and maintained at a temperature of -196° C (-321° F) until they are thawed.

¶11     Although the couple's agreements with CCRM and FLC use the terms "embryo" and "pre-embryo" interchangeably,[2] we use the term "pre-embryos" in this opinion to refer to eggs that have been fertilized using the IVF process but not implanted in a uterus. The hearings before the trial court did not include testimony regarding the medical aspects of the IVF process or the stages of development of the pre-embryos at issue in this case. In the absence of such trial testimony, other courts have looked to secondary sources discussing the correct terminology. *See McQueen v. Gadberry*, 507 S.W.3d 127, 134 n.4 (Mo. Ct. App. 2016) ("'Pre-embryo' is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. It refers to the approximately 14–day period of development from fertilization to the time when the embryo implants in the uterine wall and the 'primitive streak,' the precursor to the nervous system, appears. An embryo proper develops only after implantation. The term 'frozen embryos' is a term of art denoting cryogenically preserved pre-embryos." (quoting Elizabeth A. Trainor, Annotation, *Right of Husband, Wife, or Other Party to Custody of Frozen Embryo, Pre-embryo, or Pre-zygote in Event of Divorce, Death, or Other Circumstances*, 87 A.L.R. 5th 253 (2001))). As the court of appeals noted below, the medically accurate term for the

---

[2] The agreement with FLC states that "in this consent and agreement, anywhere the word 'embryo' is used the word 'pre-embryo' would also apply." The agreement further states that "[p]atient and partner acknowledge the 'cryopreserved embryos' will have no capacity to produce human life until by proper thawing and ascertainment of survival an embryo has been produced and properly transferred into the patient's uterus."

8

not-yet-implanted fertilized eggs at issue here is "pre-embryos." *See In re Marriage of Rooks*, 2016 COA 153, ¶ 1, __ P.3d __.

¶12 Both the 2011 and 2013 agreements with CCRM and FLC include an "Embryo and Pre-Embryo Cryopreservation/Storage Consent" form with a "Disposition Plan" recording the couple's decisions regarding the disposition of the frozen pre-embryos under certain scenarios. Mr. and Ms. Rooks selected the same options in both the 2011 and 2013 disposition plans. For example, in the event of Mr. Rooks's death, the couple agreed the pre-embryos should be "[t]ransferred to the care of the female partner if she wishes," but in the event of Ms. Rooks's death, the pre-embryos should be "[t]hawed and discarded." In the event they both died, the couple agreed the pre-embryos should be discarded.

¶13 The disposition plans further state that in the event of divorce or dissolution of marriage, "the disposition of our embryos will be part of the divorce/dissolution decree paperwork," and that FLC may deal exclusively with the person to whom all rights in the pre-embryos are awarded. The plans also provide that "[i]n the event that the divorce/dissolution decree paperwork does not address the disposition of the embryo(s)," the pre-embryos should be thawed and discarded.

¶14 In 2015, the trial court held an evidentiary hearing and issued its final orders in the dissolution of marriage case. Relevant here, the couple disagreed about what to do with the pre-embryos that were still in storage under the 2011 and 2013 agreements with CCRM and FLC. Ms. Rooks wished to preserve the pre-embryos for future implantation;

9

at the hearing, she testified that she wished to have more children but, to her knowledge, she was not able to have further children "naturally." Mr. Rooks wished to thaw and discard the pre-embryos; he testified that he did not wish to have more children from his relationship with Ms. Rooks.

¶15 The trial court devoted nearly twenty pages of discussion in its final orders to the disposition of the couple's six remaining cryogenically preserved pre-embryos. It first reasoned that the pre-embryos are not "persons" under Colorado law. Although it referenced other states' treatment of pre-embryos in judicial opinions, it based this conclusion on Colorado statutes and case law.

¶16 After surveying the law regarding frozen pre-embryo disputes in other jurisdictions, the trial court identified three approaches for resolving such disputes: (1) the contract approach, which looks to a prior agreement between the parties to determine their intent regarding the disposition of the pre-embryos; (2) the balancing of interests approach, which evaluates the parties' competing interests in receiving the pre-embryos; and (3) the contemporaneous mutual consent approach, which prevents any use or disposition of the pre-embryos without the written consent of both parties. The trial court was most persuaded by the application of the contract approach and concluded that it is most consistent with Colorado law. The court further reasoned that if the parties' agreement did not specifically address the disposition of the pre-embryos, or was "so ambiguous as to be unenforceable," the court would apply the balancing approach. It

rejected the contemporaneous mutual consent approach, reasoning that such an approach "merely grants one party the right to make a decision by default."

¶17    Starting with the contract approach, the court reviewed the text of the parties' 2011 and 2013 agreements with CCRM and FLC. It noted that the disposition plans did not specify *how* the dissolution court should determine which spouse should receive the pre-embryos. Rather, the plans stated that if the dissolution decree awarded the pre-embryos to one spouse, the clinic would deal exclusively with that spouse regarding disposition of the pre-embryos. Alternatively, the plans provided that if the parties' divorce decree did not address disposition of the pre-embryos, the pre-embryos would be thawed and discarded. To determine which spouse should receive the pre-embryos, the court looked to the agreement as a whole and concluded that (1) the agreement did not allow either spouse to "unilaterally" thaw and implant the pre-embryos without the other's consent, and (2) the couple intended that the pre-embryos should be thawed and discarded in the event of divorce where they could not achieve "mutual resolution." Therefore, the court concluded that under the contract approach, Mr. Rooks should receive the pre-embryos.

¶18    The trial court then proceeded to evaluate the dispute under the balancing of interests approach as well, weighing Mr. Rooks's "inherent privacy right not to conceive children" against Ms. Rooks's "right to become a parent."

¶19    The court reasoned that Mr. Rooks had the right to avoid the burdens of parenthood. It observed that although Colorado "does not statutorily impose support

11

and other parental obligations on a non-consenting genetic parent," Mr. Rooks could potentially face financial obligations based on a credit for an additional child on Ms. Rooks's child support worksheet. It further observed that the laws in North Carolina (where Ms. Rooks had since relocated) could be different from those in Colorado and could potentially subject Mr. Rooks to financial obligations should Ms. Rooks seek to modify or enforce her support order there. The court also noted the emotional and psychological implications for Mr. Rooks of having a biological child, stating that, "Even if [Mr. Rooks] is not legally obligated to support the new child, there are moral and social obligations that cannot be ignored."

¶20 In addition to these concerns, the trial court considered the potential effects of an additional child on the best interests of the three existing children from the marriage. The court posited that, for parenting time and other reasons, it could be detrimental for the existing children to have an additional sibling who would be the genetic but not legal child of Mr. Rooks.

¶21 Regarding Ms. Rooks's desire to use the pre-embryos to have additional children, the court reasoned that because Ms. Rooks already had three children, discarding the pre-embryos would not deprive her of her only chance to become a mother. It also expressed concerns about Ms. Rooks's financial ability to provide for another child, noting that she has no income and that one of the couple's three children has a significant medical condition.

12

¶22 Overall, the court found that Mr. Rooks's right "not to be forced to become a genetic parent" outweighed Ms. Rooks's "desire to preserve the [pre-]embryos and possibly have more children." Thus, the court determined that the balancing of interests approach also weighed in favor of awarding the pre-embryos to Mr. Rooks.

¶23 Ms. Rooks appealed from the portion of the permanent orders awarding the pre-embryos to Mr. Rooks, contending that (1) the trial court erred in its interpretation of the agreements regarding the disposition of the pre-embryos, (2) the trial court erred as a matter of law in considering certain factors in its balancing of interests calculation, and (3) the trial court's consideration of her other children and financial situation violated her constitutional rights.[3]

¶24 The court of appeals affirmed the trial court's ruling. Like the trial court, the court of appeals discussed the three basic approaches used in other jurisdictions for determining the disposition of divorcing spouses' cryopreserved pre-embryos: the contract approach, the balancing of interests approach, and the contemporaneous mutual consent approach. *Marriage of Rooks*, ¶¶ 14–22. The court of appeals concurred with those courts that have adopted the contract approach but also concluded that, in the absence of a valid agreement between the spouses regarding the disposition of remaining

---

[3] Ms. Rooks obtained a stay in the trial court to permit the pre-embryos to remain in cryo-storage pending resolution of appellate proceedings.

13

pre-embryos in the event of divorce, the court should seek to balance the parties' interests. *Id.* at ¶ 24.

¶25 Reviewing the trial court's interpretation of the written storage agreement de novo, the court of appeals concluded that the trial court erred by inferring contract terms that did not exist. *Id.* at ¶¶ 28, 31, 36. "Given the absence of enforceable contract terms on the issue," the court of appeals construed the agreement to require the dissolution court to determine who should receive the pre-embryos. *Id.* at ¶ 37.

¶26 The court of appeals then reviewed the trial court's decision under the balancing of interests test for an abuse of discretion, reasoning that the application of that test is an exercise of the court's equitable discretion. *Id.* at ¶ 40. It concluded that the trial court properly exercised its discretion in balancing the parties' competing interests and awarding the pre-embryos to Mr. Rooks. *Id.* at ¶ 41.

¶27 The court of appeals observed that the pre-embryos did not present Ms. Rooks's only opportunity to bear a child; Ms. Rooks had already borne three children. *Id.* at ¶ 44. Accordingly, it reasoned, the trial court could reasonably conclude that Mr. Rooks's interest in not producing additional offspring prevailed over Ms. Rooks's interest in having a fourth child. *Id.* at ¶ 45. The court of appeals also concluded that the trial court "appropriately considered [Mr. Rooks's] emotional and psychological well-being, in that he would likely feel a moral and social obligation for a fourth biological child, even though he may have no legal obligation to the child." *Id.* at ¶ 46. It rejected Ms. Rooks's argument that the trial court erred as a matter of law by considering the potential risk

14

that Mr. Rooks could face financial obligations for a child eventually born using the pre-embryos. *Id.* at ¶¶ 47–49. And it disagreed with Ms. Rooks that the trial court impermissibly implied that she should not have another child; rather, the trial court properly considered the inevitable financial consequences of another child for Mr. Rooks. *Id.* at ¶ 49.

¶28 The court of appeals further concluded that, in balancing the couple's competing interests, the trial court did not violate Ms. Rooks's constitutional rights[4] when it discussed the fact that she already had three children; considered the potential economic impact of another child; raised concerns about the impact of another child on the parties' existing children; and remarked on Ms. Rooks's ability to manage "such a large family" as a single parent, given her lack of employment and financial resources and the significant health issues faced by one of the children. *Id.* at ¶ 56. The court of appeals rejected Ms. Rooks's contention that the trial court impermissibly limited the number of children she could have, reasoning that, "To the extent that the permanent orders may *result* in a limitation on the number of children [Ms. Rooks] may ultimately wind up bearing through biological means, that is simply a consequence of the parties' having left it up to the court to decide who gets the remaining [pre-]embryos." *Id.* at ¶ 58.

---

[4] Ms. Rooks asserted a violation of her rights to equal protection, due process, procreational autonomy, privacy, and of her liberty interest in the care, custody, and management of her children. *Marriage of Rooks*, ¶ 52.

15

¶29 Finally, the court of appeals rejected Ms. Rooks's argument that Mr. Rooks relinquished his constitutional right not to procreate by consenting to the use of his sperm to fertilize Ms. Rooks's eggs. It reasoned that the agreement specifically provides for allocation of the pre-embryos to be decided in the dissolution decree and noted that section 19-4-106(7)(b), C.R.S. (2018), expressly allows Mr. Rooks, as a former spouse, to withdraw his consent for placement of the pre-embryos "at any time" before they are placed. *Id.* at ¶ 60.

¶30 The court of appeals thus affirmed the trial court's judgment awarding the pre-embryos to Mr. Rooks under the balancing of interests approach.

¶31 After this court granted certiorari review of the court of appeals' ruling, Ms. Rooks notified this court that she had become pregnant, but that she still wishes to use the cryogenically frozen pre-embryos to have more children.[5]

## II. Analysis

¶32 We begin by briefly reviewing the U.S. Supreme Court's and this court's reproductive rights decisions to identify the nature of the rights that underlie this marital property dispute. Because this case presents an issue of first impression in Colorado, we then examine case law from courts in other jurisdictions that have confronted similar disputes. These courts have taken various approaches, but all the approaches generally seek to (1) secure both parties' consent where possible and (2) avoid results that compel

---

[5] At oral argument, the parties noted that Ms. Rooks had since given birth.

one party to become a genetic parent against his or her will except in rare circumstances. Turning next to Colorado law, we discuss the Colorado statutes relevant to assisted reproduction. These statutes demonstrate the General Assembly's intent to allow an individual to opt out of legal parenthood of a child born of assisted reproduction in the event of divorce or where the individual no longer consents to assisted reproduction. However, these statutes do not provide a method for resolving disputes over which spouse should be awarded a couple's remaining pre-embryos in the event of divorce. In the absence of specific legislative guidance in these circumstances, we look to the general statutory command in dissolution proceedings requiring a court to divide the marital property equitably after considering all relevant factors.

¶33 Consistent with this requirement, we follow a number of courts in adopting a balancing of interests approach to determine the proper disposition of a couple's pre-embryos where, as here, the parties' written agreement does not address disposition of the pre-embryos in the event of divorce. In crafting the framework we adopt today, we emphasize that, where possible, courts should strive to award pre-embryos in a manner that allows both parties to exercise their rights to procreational autonomy.

¶34 Here, the parties' written agreement does not resolve how the pre-embryos should be allocated in the event of divorce, and thus, for purposes of this dissolution proceeding, the disposition of these remaining pre-embryos must be resolved by balancing the parties' interests. Because the trial court and court of appeals considered certain inappropriate factors in attempting to balance the parties' interests here, we reverse the

17

judgment of the court of appeals and remand the case with directions to return the matter to the trial court to apply the framework we adopt today.

## A. Reproductive Rights and Autonomy

¶35 Although this case concerns the equitable division of marital property in a divorce proceeding, we recognize that the parties' competing interests in the disputed pre-embryos derive from constitutional rights in the realm of reproductive choice. We therefore briefly discuss the governing case law in this area.

¶36 The U.S. Supreme Court has recognized the importance of individual autonomy over decisions involving reproduction. Over seventy-five years ago, the Court recognized that procreation is "one of the basic civil rights" and that marriage and procreation are fundamental to human existence and survival. *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942). As the Court considered new questions involving reproductive rights, such as the right to access contraception, it began to articulate those rights as part of a cluster of privacy rights grounded in several fundamental constitutional guarantees. *See Griswold v. Connecticut*, 381 U.S. 479, 485 (1965). The Court also began to acknowledge an individual's privacy right to control decisions regarding procreation and family relationships: "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). In addition to encompassing choices relating to "marriage," "procreation," "contraception," "family relationships," and "child rearing

18

and education," the right of privacy "encompass[es] a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 152–53 (1973).

¶37 The Supreme Court's more recent opinions in this area have preserved an individual's ability to make his or her own decisions regarding matters involving procreation and reproduction. *See Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 70 (1976) ("[W]e cannot hold that the State has the constitutional authority to give the spouse unilaterally the ability to prohibit the wife from terminating her pregnancy, when the State itself lacks that right."); *Bellotti v. Baird*, 443 U.S. 622, 639–43 (1979) (reaffirming that a state may not lawfully authorize an absolute parental veto over the decision of a minor to terminate her pregnancy); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) ("[A] statute which . . . has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 877 (1992) (plurality opinion))).

¶38 This court has similarly recognized the importance of individual choice and consent in exercising such rights. In addressing a petition to sterilize an incapacitated woman, this court recognized an individual's fundamental right to procreate and to avoid procreation, noting that "[t]he decision whether to bear or beget a child is a constitutionally protected choice." *Matter of Romero*, 790 P.2d 819, 822 (Colo. 1990). Although practices such as compulsory sterilization amount to an unconstitutional infringement of the fundamental right to procreate, the "right to bear or beget children

19

implies a more general right to reproductive autonomy which must include under certain circumstances the opportunity to prevent procreation through a variety of means including non-compulsory sterilization." *Matter of A.W.*, 637 P.2d 366, 369 (Colo. 1981). We have observed that the cases addressing restrictions on abortions "also have as their basis the constitutional right of individual control over procreative decisions." *Id.* "Reading [the abortion] cases in conjunction with *Skinner* leads to the conclusion that an individual has the fundamental right not only to bear children, but to decide not to be the source of another life as well." *Id.*

¶39  We note that the right to procreate or to avoid procreation does not depend on the means by which that right is exercised. An individual may exercise her right to procreate through conventional conception or IVF—or she may exercise her right to avoid procreation through abstinence, contraception, voluntary sterilization, or even abortion—but the nature of the right itself (to procreate or to avoid procreation) remains the same.

### B. Other Jurisdictions

¶40  Having acknowledged the rights that underlie the parties' dispute here, we turn to case law from courts in other jurisdictions that have confronted similar disputes. These courts have adhered to or combined aspects of three main approaches: (1) interpreting the parties' contract or agreement regarding disposition of the pre-embryos; (2) balancing the parties' respective interests in receiving the pre-embryos; or (3) requiring the parties' mutual contemporaneous consent regarding disposition of the pre-embryos.

20

¶41    Many jurisdictions begin by looking for a preexisting agreement between the parties regarding disposition of remaining pre-embryos, as evidenced by consent or storage agreements between the IVF facility and the parties. *See, e.g., Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998) ("Agreements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them."); *In re Marriage of Dahl & Angle*, 194 P.3d 834, 842 (Or. Ct. App. 2008) ("Absent a countervailing policy, it is just and proper to dispose of the [pre-]embryos in the manner that the parties chose at the time that they underwent the IVF process."); *Roman v. Roman*, 193 S.W.3d 40, 49–50 (Tex. App. 2006) (recognizing that "the public policy of [Texas] would permit a husband and wife to enter voluntarily into an agreement, before implantation, that would provide for a[] [pre-]embryo's disposition in the event of a contingency, such as divorce, death, or changed circumstances" and that such agreements should be presumed valid and enforced).[6]  In *Kass*, the New York Court of Appeals determined that the IVF program

---

[6] Some courts have concluded that such agreements are unenforceable for public policy reasons. *See, e.g., A.Z. v. B.Z.*, 725 N.E.2d 1051, 1056–57 (Mass. 2000) (concluding it was "dubious at best that [the clinic consent form] represents the intent of the husband and the wife regarding disposition of the [pre-embryos] in the case of a dispute between them," and that, in any event, the court "would not enforce an agreement that would compel one donor to become a parent against his or her will"); *see also J.B. v. M.B.*, 783 A.2d 707, 719 (N.J. 2001) (adopting rule that, for public policy reasons, courts should "enforce agreements entered into at the time in vitro fertilization is begun, subject to the right of either party to change his or her mind about disposition up to the point of use or destruction of any stored [pre-embryos]").

consent forms signed by the couple during their marriage manifested their mutual intent that, in the event of divorce, the pre-embryos should be donated for research to the IVF program. 696 N.E.2d at 180–81. The court thus ordered that the agreement be enforced. *Id.* at 182. Similarly, in *Marriage of Dahl & Angle* and *Roman*, the courts resolved the dispute by interpreting the agreements the parties signed with the IVF clinics when they created the pre-embryos. *See Marriage of Dahl & Angle*, 194 P.3d at 842; *Roman*, 193 S.W.3d at 54–55.

¶42 In some cases, courts have concluded that no enforceable agreement existed or that an existing agreement did not address who should receive the remaining pre-embryos in the event of divorce. For example, in *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992), the parties did not execute a written agreement regarding the disposition of any preserved pre-embryos when they signed up for the IVF program. *Id.* at 590; *see also McQueen*, 507 S.W.3d at 155–56 (affirming finding that agreement regarding disposition of pre-embryos upon divorce was "not entered into freely, fairly, knowingly, understandingly, and in good faith with full disclosure" and was therefore not enforceable); *Reber v. Reiss*, 42 A.3d 1131, 1136 (Pa. Super. Ct. 2012) (finding no enforceable agreement where neither party signed portion of consent form related to disposition of pre-embryos upon divorce).

¶43 In cases where no enforceable agreement exists, many courts have conducted what has been termed a "balancing of interests" test to decide how to award or dispose of the pre-embryos. The Supreme Court of Tennessee employed such an approach in *Davis*.

22

842 S.W.2d at 603. There, the court acknowledged that the conflicting interests at stake were of "equal significance—the right to procreate and the right to avoid procreation." *Id.* at 601. Given the absence of an enforceable agreement, the court resolved the dispute by considering "the positions of the parties, the significance of their interests, and the relative burdens that will be imposed by differing resolutions." *Id.* at 603. In balancing these interests, the court considered several factors, including (1) the burden of unwanted parenthood on the ex-husband who wished to discard the pre-embryos, particularly in light of his own childhood experience of being separated from his parents; (2) the ex-wife's interest in donating the pre-embryos to another couple to avoid the emotional burden of knowing that the IVF procedures were futile; and (3) the ex-wife's ability to become a parent by other reasonable means in the future. *Id.* at 603–04. Ultimately, the *Davis* court concluded that the balance of interests weighed in favor of the ex-husband's desire to discard the pre-embryos. *Id.* at 604.

¶44 Other courts have employed a similar balancing of interests approach where no enforceable agreement exists, including in cases where one party wishes to implant the pre-embryos to have a child. *See J.B.*, 783 A.2d at 719 (evaluating the interests of both parties); *Reber*, 42 A.3d at 1137 (balancing wife's interest in having a biological child against husband's interest in avoiding unwanted procreation); *Szafranski v. Dunston*, 34 N.E.3d 1132, 1162 (Ill. Ct. App. 2015) (reviewing the trial court's balancing of one partner's interest in having a biological child against the other partner's interest in avoiding becoming a parent). In balancing the parties' interests, these courts have

23

considered whether the party wishing to use the pre-embryos to procreate has alternate means to become a biological parent. *See J.B.*, 783 A.2d at 717 (reasoning that the ex-husband was already a father and was capable of fathering additional children and thus affirming the ex-wife's right to prevent implantation of the [pre-]embryos); *Reber*, 42 A.3d at 1142 (reasoning that the balance of interests weighed in wife's favor where the "pre-embryos are likely Wife's only opportunity to achieve biological parenthood"); *Szafranski*, 34 N.E.3d at 1162 (affirming the lower court's determination that the female partner's interest in using the pre-embryos outweighed the male partner's interest in not using them because "the sole purpose for using [his] sperm to fertilize [her] last viable eggs was to preserve her ability to have a biological child in the future at some point after her chemotherapy treatment ended").

¶45 Finally, a small minority of courts have adopted a "mutual contemporaneous consent" approach, under which the court will not award the pre-embryos over the objection of either party. Instead, "no transfer, release, disposition, or use of the [pre-]embryos can occur without the signed authorization of both donors." *In re Marriage of Witten*, 672 N.W.2d 768, 783 (Iowa 2003); *see also McQueen*, 507 S.W.3d at 157 (affirming the trial court's judgment awarding the pre-embryos to the parties jointly and ordering that no transfer, release, or use shall occur without the signed authorization of both parties). This approach recognizes that disputed pre-embryos are "not easily susceptible to a just division because conflicting constitutional rights are at issue." *McQueen*, 507 S.W.3d at 157. In theory, the mutual contemporaneous consent approach purportedly

"subjects neither party to any unwarranted governmental intrusion but rather leaves the intimate decision of whether to potentially have more children to the parties alone." *Id.*

¶46    However, the mutual contemporaneous consent approach has been criticized by other courts as being "totally unrealistic" because if the parties were capable of reaching an agreement, then they would not be in court. *Reber*, 42 A.3d at 1135 n.5. As both the trial court and court of appeals recognized in this case, the mutual contemporaneous consent approach gives one party a de facto veto over the other party by avoiding any resolution until the issue is eventually mooted by the passage of time. *See Marriage of Rooks*, ¶ 23. And as at least one scholar has pointed out, this de facto veto creates incentives for one party to leverage his or her power unfairly. *See* Mark P. Strasser, *You Take the Embryos but I Get the House (and the Business): Recent Trends in Awards Involving Embryos Upon Divorce*, 57 Buff. L. Rev. 1159, 1210 (2009) ("[O]ne could imagine such a person imposing continuing psychic damage by hinting that he or she might consent to the ex-spouse's use of the [pre-]embryos sometime in the future—the ex-spouse might well continue to be on an emotional rollercoaster when considering the possibility of finally becoming a parent. Or the [pre-]embryos might in effect be held hostage—they would be released for use only if the ex-spouse were willing to give up something valuable in return, for example, in a property settlement or in exchange for more favorable support terms."). Because the mutual contemporaneous consent approach allows one party to "change his or her mind about disposition up to the point of use or destruction of any stored [pre-]embryo," regardless of any preexisting agreement, *see*

25

*Marriage of Witten*, 672 N.W. 2d at 782, it injects legal uncertainty into the process. Thus, this approach potentially increases litigation in already emotionally charged and fundamentally private matters.

¶47 Although these three approaches have been characterized and discussed as three different "rules" or "methods" for resolving disputes over frozen pre-embryos, we note that the approaches share conceptual underpinnings and reflect common goals. Both the contract approach and the mutual contemporaneous consent approach prioritize the parties' mutual consent and agreement. The contract approach simply encourages the parties to arrive at agreement regarding the disposition of the pre-embryos in advance of divorce. By contrast, the mutual contemporaneous consent approach requires the parties' mutual consent whenever a disposition occurs—regardless of any preexisting agreements. *See Marriage of Witten*, 672 N.W.2d at 777–78 (explaining that although the two approaches share an underlying premise, the important question is "at what time does the partners' consent matter?" (quoting Carl H. Coleman, *Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes*, 84 Minn. L. Rev. 55, 91 (1999))). (Indeed, the mutual contemporaneous consent approach eliminates any incentive for parties to agree up front about what should happen with the pre-embryos in the event of divorce and thereby avoid litigation.)

¶48 Further, many courts combine one or more of the approaches in order to resolve disputes—e.g., applying the contract approach first and, if no enforceable agreement exists, then balancing the parties' competing interests. *See, e.g.*, *Davis*, 842 S.W.2d at 604

26

(holding that disputes involving the disposition of frozen pre-embryos should be resolved first by looking to an agreement between the parties but that "[i]f no prior agreement exists, then the relative interests of the parties in using or not using the [pre-embryos] must be weighed").

### C. Colorado Statutes

¶49 Keeping in mind the approaches taken in other jurisdictions, we now turn to Colorado statutes for direction in resolving the case before us.

¶50 The Colorado Probate Code addresses legal parenthood in the context of assisted reproduction. Relevant here, section 15-11-120(4), C.R.S. (2018), provides that "a parent-child relationship exists between a child of assisted reproduction and the husband of the child's birth mother if the husband provided the sperm that the birth mother used during his lifetime for assisted reproduction." However, this provision acknowledges two exceptions to this general rule of legal parenthood. First, section 15-11-120(9) provides, "[i]f a married couple is divorced before placement of eggs, sperm, or embryos, a child resulting from the assisted reproduction is not a child of the birth mother's former spouse, unless the former spouse consented in a record that if assisted reproduction were to occur after divorce, the child would be treated as the former spouse's child." Second, section 15-11-120(10) provides that "[i]f, in a record, an individual withdraws consent to assisted reproduction before placement of eggs, sperm, or embryos, a child resulting from the assisted reproduction is not a child of that individual." In other words, subsections (9) and (10) make clear that a spouse who either divorces or withdraws consent to assisted

27

reproduction prior to the placement of eggs, sperm, or embryos is not the legal parent of a resulting child. Importantly, subsections (9) and (10) show that the legislature has implicitly rejected the mutual contemporaneous consent approach. If mutual contemporaneous consent were required to proceed with implantation, there would be no need to address the legal relationship between a non-consenting party and a resulting child because that child could not be born in the first place. That these provisions refer to a "resulting" child despite a divorce or a spouse's withdrawal of "consent" shows that the consent contemplated is to legal parenthood of the resulting child, not to implantation of the couple's pre-embryo.

¶51 Article 4 of the Colorado Children's Code, titled the "Uniform Parentage Act," similarly addresses consent to legal parenthood in the context of assisted reproduction. Section 19-4-106(1), C.R.S. (2018), which addresses assisted reproduction by married couples using sperm or eggs donated by a third party, states that when a married couple "consents" to such assisted reproduction, the spouse who does not contribute eggs or sperm is nevertheless "treated in law as if [they] were the natural [parent] of a child thereby conceived." Section 19-4-106(7)(a) goes on to provide that "[i]f a marriage is dissolved before placement of eggs, sperm, or embryos, the former spouse is not a parent of the resulting child unless the former spouse consented in a record that if assisted reproduction were to occur after a dissolution of marriage, the former spouse would be a parent of the child." Section 19-4-106(7)(b) adds that "[t]he consent of a former spouse

28

to assisted reproduction may be withdrawn by that individual in a record at any time before placement of eggs, sperm, or embryos."

¶52 Amicus Colorado Chapter of the American Academy of Matrimonial Lawyers reads subsection (7)(b) to convey a public policy that, like the contemporaneous mutual consent approach, requires a former spouse's consent to the placement of eggs, sperm, or embryos. We disagree. We "must read and consider the statutory scheme as a whole to give consistent, harmonious[,] and sensible effect to all its parts." *People v. Stellabotte*, 2018 CO 66, ¶ 32, 421 P.3d 174, 180 (quoting *Martin v. People*, 27 P.3d 846, 851 (Colo. 2001)). If paragraph (b) were instead its own subsection, amicus might have a point. But paragraph (b) is not a freestanding subsection. It is part of subsection (7) and therefore must be read accordingly. Read in conjunction with subsection (7)(a), the "consent" in subsection (7)(b) logically refers to the former spouse's consent to legal parenthood of a "resulting child" conceived by assisted reproduction.[7]

---

[7] The 2000 version (amended in 2002) of the Uniform Parentage Act promulgated by the National Conference of Commissioners on Uniform State Laws contains a similar provision addressing the effect of dissolution or withdrawal of consent on legal parenthood of a resulting child:

> (a) If a marriage is dissolved before placement of eggs, sperm, or embryos, the former spouse is not a parent of the resulting child unless the former spouse consented in a record that if assisted reproduction were to occur after a divorce, the former spouse would be a parent of the child.

> (b) The consent of a woman or a man to assisted reproduction may be withdrawn by that individual in a record at any time before placement of eggs, sperm, or embryos. An individual who withdraws consent under this section is not a parent of the resulting child.

29

¶53 Section 19-4-106(8) does not alter our view. Subsection (8) provides that "[i]f a spouse dies before placement of eggs, sperm, or embryos, the deceased spouse is not a parent of the resulting child unless the deceased spouse consented in a record that if assisted reproduction were to occur after death, the deceased spouse would be a parent of the child." This provision simply terminates a spouse's consent to be a legal parent upon that spouse's death, unless the spouse affirmatively agrees in a record that his or her consent to be the legal parent of a resulting child will extend beyond that spouse's death.

¶54 In sum, the legislature's repeated references in both the Probate Code and Children's Code to the resulting "child," *see* §§ 15-11-120(9)-(10); § 19-4-106(7), make clear that these provisions address the legal parentage of a child eventually born using assisted reproduction—and not whether the assisted reproduction process may continue (via implantation of preserved pre-embryos) over one partner's objection.

¶55 Thus, Colorado statutes provide that an individual is not obligated to be the legal parent of a child eventually born as a result of their contribution of genetic material where the couple divorces, or where one party withdraws consent. Although these statutes address the resulting legal relationships with any children eventually born using assisted reproductive technology, they do not address how a trial court should resolve disputes

Effect of Dissolution of Marriage or Withdrawal of Consent., Unif. Parentage Act (2000) § 706.

30

over how to allocate remaining cryogenically preserved pre-embryos in a dissolution of marriage proceeding. In the absence of instructions from the legislature in these specific circumstances, it falls to us provide a framework for courts to apply when addressing these disputes.

¶56    Before turning to that task, we note that Colorado law generally provides that pre-embryos are not "persons," as a legal matter. *See* § 13-21-1204, C.R.S. (2018) ("Nothing in this part [Damages for Unlawful Termination of Pregnancy] shall be construed to confer the status of 'person' upon a human embryo, fetus, or unborn child at any stage of development prior to live birth."); § 18-3.5-110, C.R.S. (2018) ("Nothing in this article [Offenses Against Pregnant Women] shall be construed to confer the status of 'person' upon a human embryo, fetus, or unborn child at any stage of development prior to live birth.").

¶57    At the same time, we acknowledge that pre-embryos contain the potential for human life and are formed using genetic material from two parties with significant, but potentially competing, interests in their ultimate disposition. Thus, we agree with courts that have categorized pre-embryos as marital property of a special character. *See Davis*, 842 S.W. 2d at 597 ("We conclude that pre-embryos are not, strictly speaking, either 'persons' or 'property,' but occupy an interim category that entitles them to special respect . . . ."); *McQueen*, 507 S.W.3d at 149 (trial court did not err in classifying pre-embryos as marital property of a special character instead of children).

31

¶58 Although Colorado statutes do not address the proper disposition of marital pre-embryos upon divorce, the Uniform Dissolution of Marriage Act ("UMDA") does generally direct a court presiding over dissolution proceedings to "divide the marital property . . . in such proportions as the court deems just." § 14-10-113(1), C.R.S. (2018); *see also In re Balanson*, 25 P.3d 28, 35 (Colo. 2001) (a court must make an equitable distribution of marital property after considering all relevant factors). That the UMDA requires the court to divide the marital property "in such proportions as the court deems just" directs that some sort of balancing is appropriate here. *See* § 14-10-113(1).

### D. Resolving Pre-Embryo Disputes in Colorado

¶59 With these legal principles in mind—which derive from the foregoing discussion of case law regarding constitutional rights in the realm of reproductive choice, case law from other jurisdictions resolving similar disputes, and applicable Colorado statutes—we now address how courts in Colorado should resolve disagreements over a couple's cryogenically preserved pre-embryos when that couple divorces.

¶60 First, we reject the mutual contemporaneous consent approach. As discussed above, the repeated references in both the Probate Code and Children's Code to a resulting child, *see* §§ 15-11-120(9)-(10); § 19-4-106(7), reflect the legislature's implicit rejection of the mutual contemporaneous consent approach. Again, if the parties' mutual contemporaneous consent were required to proceed with implantation, there would be no need to address the legal relationship between a non-consenting party and a resulting child, because that child could not exist. We also agree with those courts that have

32

criticized the mutual contemporaneous consent approach as being "totally unrealistic" because if the parties were capable of reaching an agreement, they would not be in court. *Reber*, 42 A.3d at 1135 n.5. It is similarly unrealistic to think that parties who cannot reach agreement on a topic so emotionally charged will somehow reach resolution after a divorce is finalized. In addition, we share the concern expressed by the trial court and court of appeals that the mutual contemporaneous consent approach gives one party a de facto veto over the other party by avoiding any resolution until the issue is eventually mooted by the passage of time. *See Marriage of Rooks*, ¶ 23. And we worry that this de facto veto creates incentives for a party to leverage this issue unfairly in divorce proceedings. Moreover, because it disregards the parties' preexisting agreements, the mutual contemporaneous consent approach injects legal uncertainty into the process and eliminates any incentive for the parties to avoid litigation by agreeing in advance about disposition of remaining pre-embryos in the event of divorce. Finally, the mutual contemporaneous consent approach essentially requires us to abdicate our judicial responsibilities by ignoring the legislature's directive to distribute equitably the parties' marital property in a dissolution proceeding. The parties here have turned to the courts to resolve their dispute. We cannot simply do nothing.

¶61 Instead, considering the nature and equivalency of the underlying liberty and privacy interests at stake, we conclude that a court presiding over dissolution proceedings should strive, where possible, to honor both parties' interests in procreational autonomy when resolving these disputes. Thus, we hold that a court

33

should look first to any existing agreement expressing the spouses' intent regarding disposition of the couple's remaining pre-embryos in the event of divorce. In the absence of such an agreement, a court should seek to balance the parties' respective interests when awarding the pre-embryos, as discussed more fully below.

¶62  We agree with those courts that first look for an enforceable agreement between the parties regarding the disposition of the pre-embryos upon divorce. We do not interpret a party's commencement of the IVF process, on its own, to establish the party's automatic consent to become the genetic parent of all possible children that could result from successful implantation of the pre-embryos. In fact, the forms that ask parties to elect specific disposition options for various contingencies recognize that, by undergoing IVF, parties do not automatically consent to use of the pre-embryos potentially years later, under changed circumstances. Additionally, the statutes addressing legal parenthood in this context recognize that divorce likely alters the parties' mutual intent to become parents that existed when the couple embarked on the IVF process. *See* § 15-11-120(9) (if a married couple divorces before pre-embryos are implanted, "a child resulting from the assisted reproduction is not a child of the birth mother's former spouse, unless the former spouse consented in a record"); *see also* § 19-4-106(7)(a).

¶63  On the other hand, binding agreements "minimize misunderstandings and maximize procreative liberty by reserving to the progenitors the authority to make what is in the first instance a quintessentially personal, private decision." *Kass*, 696 N.E. 2d at 180. We agree that, "[t]o the extent possible, it should be the progenitors—not the State

34

and not the courts—who by their prior directive make this deeply personal life choice." *Id.*; *see also Davis*, 842 S.W.2d at 597 (noting that starting with a prior agreement regarding the disposition of the pre-embryos "is in keeping with the proposition that the progenitors, having provided the gametic material giving rise to the pre-embryos, retain decision-making authority as to their disposition"). Thus, disputes in dissolution proceedings over the disposition of cryogenically preserved pre-embryos should be resolved first by looking to an existing agreement expressing the spouses' intent in the event of divorce.

¶64 However, in the absence of an enforceable agreement regarding disposition of the pre-embryos, and where the parties have turned to the courts to resolve their dispute, the dissolution court should balance the parties' respective interests and award the pre-embryos accordingly. Recognizing a couple's cryogenically preserved pre-embryos as marital property of a special character, *see Davis*, 842 S.W. 2d at 597, the underlying principle that informs our balancing test is autonomy over decisions involving reproduction. Thus, the framework we adopt in this special context is distinct from, and more narrow than, the trial court's consideration of various factors in determining equitable distribution of other forms of marital property. *See Balanson*, 25 P.3d at 35. Here, underlying the court's disposition of this special form of property are the parties' individual interests in either achieving or avoiding genetic parenthood through use of the disputed pre-embryos.

¶65   We first discuss a non-exhaustive list of considerations that a court should weigh in disposing of the marital pre-embryos. Factors not discussed here may also be relevant to the analysis depending on the circumstances of the parties before the dissolution court. We then identify certain factors that should never be taken into account.

¶66   To begin with, courts should consider the intended use of the party seeking to preserve the disputed pre-embryos. A party who seeks to become a genetic parent through implantation of the pre-embryos, for example, has a weightier interest than one who seeks to donate the pre-embryos to another couple. *See Davis*, 842 S.W.2d at 603–04 (concluding that ex-husband's interest in avoiding becoming a genetic parent outweighed wife's interest in donating the pre-embryos to another couple); *J.B.*, 783 A.2d at 717 (prioritizing ex-wife's interest in preventing further use of the pre-embryos over ex-husband's desire to donate them).

¶67   A court should also consider the demonstrated physical ability (or, conversely, inability) of the party seeking to implant the disputed pre-embryos to have biological children through other means.[8] *Compare J.B.*, 783 A.2d at 717 (observing that ex-husband's opportunity to have additional genetic children did not depend on the

---

[8] Courts in other jurisdictions have resolved the factual question regarding one party's ability reasonably to achieve genetic parenthood without the preserved pre-embryos by looking to testimony from the parties regarding their medical history and consultations with medical professionals. *See Reber*, 42 A.3d at 1138; *Szafranski*, 34 N.E. 3d at 1162.

36

pre-embryos), *with Reber*, 42 A.3d at 1137 (considering that ex-wife had "no ability to procreate biologically without the use of the disputed pre-embryos").

¶68    Relatedly, the court should consider the parties' original reasons for pursuing IVF, which may favor preservation over disposition. For example, the couple may have turned to IVF to preserve a spouse's future ability to have biological children in the face of fertility-implicating medical treatment, such as chemotherapy. *See Szafranski*, 34 N.E.3d at 1162 ("[T]he sole purpose for [undergoing IVF] was to preserve [one partner's] ability to have a biological child in the future at some point after her chemotherapy treatment ended. The parties both recognized this when they agreed to create the pre-embryos together."); *Reber*, 42 A.3d at 1137 ("Wife testified that she underwent IVF only after she was diagnosed with breast cancer, after consultation with her doctor, and then she delayed chemotherapy by two to three weeks to undergo the process.").

¶69    The court's analysis should also include consideration of hardship for the person seeking to avoid becoming a genetic parent, including emotional, financial, or logistical considerations. *See Davis*, 842 S.W.2d at 603–04 (considering ex-husband's opposition to fathering a child who would not live with both parents because of his own childhood experiences involving separation from his parents).

¶70    In addition, a court should consider either spouse's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce proceedings. *See In re Marriage of Manzo*, 659 P.2d 669, 674 (Colo. 1983) ("[B]efore a court incorporates property division provisions of a separation agreement into a dissolution decree, it should first

37

review the provisions for fraud, overreaching, . . . or sharp dealing not consistent with the obligations of marital partners to deal fairly with each other . . . .").

¶71 Factors other than the ones described above may be relevant on a case-by-case basis. That said, we hold that the following are improper considerations in a dissolution court's allocation of a couple's cryogenically preserved pre-embryos. First, we decline to adopt a test that would allow courts to limit the size of a family based on financial and economic distinctions. *Cf. Skinner*, 316 U.S. at 541 (discussing procreation as "one of the basic civil rights of man"). Thus, a dissolution court should not assess whether the party seeking to become a genetic parent using the pre-embryos can afford another child. Nor shall the sheer number of a party's existing children, standing alone, be a reason to preclude preservation or use of the pre-embryos. Finally, we note that some courts have mentioned adoption as an alternative to biological or genetic parenthood through conventional or assisted reproduction. *See Davis*, 842 S.W.2d at 604. However, because we conclude the relevant interest at stake is the interest in achieving or avoiding *genetic* parenthood, courts should not consider whether a spouse seeking to use the pre-embryos to become a genetic parent could instead adopt a child or otherwise parent non-biological children. *See Reber*, 42 A.2d at 1138 ("There is no question that the ability to have a biological child and/or be pregnant is a distinct experience from adoption. Thus, simply because adoption or foster parenting may be available . . . does not mean that such options should be given equal weight in a balancing test.").

38

¶72    The framework that we adopt today recognizes that both spouses have equally valid, constitutionally based interests in procreational autonomy.  It encourages couples to record their mutual consent regarding the disposition of remaining pre-embryos in the event of divorce by an express agreement.  Under such an agreement, if one spouse has consented to awarding the pre-embryos to the other spouse or to donating them to another couple for implantation, courts should give effect to that decision.  Where the parties' consent to disposition of the pre-embryos in the event of divorce is not memorialized in an enforceable agreement, and the parties therefore must turn to a court to resolve their dispute, the approach we adopt today tasks the dissolution court with weighing the interests at stake and awarding the pre-embryos accordingly.  Importantly, the balancing of interests approach we adopt is consistent with Colorado law directing dissolution courts to divide marital property based on a consideration of relevant factors, while taking into account that pre-embryos are marital property of a special character.

## E. Application

¶73    Here, Mr. and Ms. Rooks reached agreement regarding the disposition of pre-embryos in the event of certain contingencies (such as the death of one or both of the spouses).  However, they failed to agree in advance how remaining cryogenically preserved pre-embryos should be allocated in the event of divorce.  Instead, as the court of appeals correctly concluded, their written agreement left it to the dissolution court to determine how to allocate the pre-embryos. *Marriage of Rooks*, ¶ 31.  Thus, awarding the pre-embryos in accordance with law governing the distribution of marital property also

39

satisfies the expectations of the parties, who specified that in the event of divorce, the dissolution decree would address the disposition of any remaining cryogenically preserved pre-embryos. Because we announce a new framework for resolving disputes regarding the disposition of pre-embryos frozen during marriage in the event of divorce, and because the trial court and court of appeals considered certain inappropriate factors in attempting to balance the parties' interests here, we reverse the judgment of the court of appeals and remand the case with instructions to return the matter to the trial court to balance the parties' interests under the approach we adopt today.

### III. Conclusion

¶74    In the absence of more specific legislative guidance in these circumstances, we adopt a balancing framework for courts to apply in allocating disputed pre-embryos in divorce proceedings. Because the underlying interests at stake are the equivalently important, yet competing, right to procreate and right to avoid procreation, courts should strive, where possible, to honor both parties' interests in procreational autonomy. Thus, we hold that courts should award pre-embryos first by looking to an existing enforceable agreement addressing the parties' wishes regarding disposition of remaining pre-embryos in the event of divorce. In the absence of such an agreement, a dissolution court tasked with resolving such a dispute should weigh the parties' respective interests in receipt of the pre-embryos. In balancing those interests, courts should consider the intended use of the party seeking to preserve the pre-embryos; a party's demonstrated ability, or inability, to become a genetic parent through means other than use of the

disputed pre-embryos; the parties' reasons for undertaking IVF in the first place; the emotional, financial, or logistical hardship for the person seeking to avoid becoming a genetic parent; any demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce process; and other considerations relevant to the parties' specific situation.  However, courts should not consider whether the party seeking to become a genetic parent using the pre-embryos can afford a child.  Nor shall the sheer number of a party's existing children, standing alone, be a reason to preclude preservation or use of the pre-embryos.  Finally, courts should not consider whether the party seeking to become a genetic parent using the pre-embryos could instead adopt a child or otherwise parent non-biological children.

¶75    We reverse the judgment of the court of appeals and remand with directions to return the matter to the trial court to apply the balancing framework we adopt today.

**JUSTICE HOOD** dissents, and **CHIEF JUSTICE COATS** and **JUSTICE SAMOUR** join in the dissent.

JUSTICE HOOD, dissenting.

¶76    This case requires us to consider the proper role of courts when parties disagree during a divorce about whether to use their cryogenically frozen pre-embryos to procreate through in vitro fertilization ("IVF").  Because I believe a court should never infringe on a person's constitutional right to avoid procreation through IVF, I disagree with the majority's decision to entangle our courts in such deeply personal disputes by employing a multi-factor balancing test.  Instead, I would embrace the contemporaneous mutual consent approach outlined by the majority.  Maj. op. ¶ 45.  Doing so would not only avoid invading citizens' constitutional rights but also comport with relevant Colorado statutes and advance sound public policy.  Therefore, I respectfully dissent.

## I.  Freedom from Government Infringement on a Person's Decision to Not Procreate

¶77    The majority has provided a comprehensive overview of the relevant case law.  Maj. op. ¶¶ 36–48.  Therefore, I will refrain from simply echoing it now.  Instead, I focus on how the tenets of constitutional law outlined by the majority should apply to IVF cases.

¶78    As the majority discusses, there are two fundamental rights implicated when considering this type of IVF dispute: (1) the right to procreate of the party who wants to implant the pre-embryo and (2) the right to avoid procreation of the party who does not want to implant the pre-embryo.  *Id.* at ¶ 3.  When there is such disagreement, only one party can prevail.  Here, as to these pre-embryos, either Mr. Rooks will exercise his right

1

to not procreate or Ms. Rooks will exercise her right to procreate. So, what is the role of the courts in this legal minefield?

¶79 To answer this question, we must first consider whether we really must balance constitutional rights at all. Stated differently: Would a court's inaction infringe on any right of the party who wishes to procreate? My answer is no, because while the U.S. Constitution affords many protections related to procreation, there exists no constitutional right to use the coercive power of the state to compel procreation. Indeed, "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). "[T]he right to bear or beget children implies a more general right to reproductive autonomy which must include under certain circumstances the opportunity to prevent procreation through a variety of means . . . ." *In re A. W.*, 637 P.2d 366, 369 (Colo. 1981).

¶80 Here, the impediment to Ms. Rooks exercising her right to procreate is not the court, it is Mr. Rooks. In order for a person to exercise his or her right to procreate, obviously a second party is needed. Whether it be two parties through conventional procreation or two parties through IVF, procreation cannot occur without a sperm and an egg. The fact that the person wanting to procreate does not have a second party also willing to procreate does not mean the court has infringed on anyone's rights. It is not the role of the court to compel the second party to consent. Here, Ms. Rooks cannot

exercise her right to procreate, not because of any state action but, instead, because Mr. Rooks is exercising his right to avoid procreation.

¶81 Under the majority's test, the courts are forced to mediate a fundamentally personal decision and, in the process, infringe on a litigant's constitutional rights. In some contexts, this judicial choice may be unavoidable. Not so here. The contemporaneous mutual consent approach appropriately minimizes the government's role in resolving this constitutional dilemma.

## II. Contemporaneous Mutual Consent Approach

¶82 Of the approaches outlined by the majority, only the contemporaneous mutual consent approach adequately shields citizens from unwarranted governmental intrusion. *See In re Marriage of Witten*, 672 N.W.2d 768, 783 (Iowa 2003); *A.Z. v. B.Z.*, 725 N.E.2d 1051, 1057–59 (Mass. 2000); *McQueen v. Gadberry*, 507 S.W.3d 127, 157 (Mo. Ct. App. 2016). Under this test:

> no transfer, release, disposition, or use of the embryos can occur without the signed authorization of both donors. If a stalemate results, the status quo would be maintained. The practical effect will be that the embryos are stored indefinitely unless both parties can agree to destroy the fertilized eggs. Thus, any expense associated with maintaining the status quo should logically be borne by the person opposing destruction.

*Witten*, 672 N.W.2d at 783. By emphasizing that consent is always essential, the mutual contemporaneous consent approach leaves this highly personal choice in the hands of donors. *Id.* at 783 (reasoning that balancing tests in this context merely "substitute[] the court as decision maker"); *A.Z.*, 725 N.E.2d at 1058 ("[F]orced procreation is not an area amenable to judicial enforcement."); *McQueen*, 507 S.W.3d at 157 (finding that mutual

3

consent "subjects neither party to any unwarranted governmental intrusion"). At the same time, this approach recognizes the validity of agreements between donors and clinics. *Witten*, 672 N.W.2d at 782. Thus, under contemporaneous mutual consent, one or both partners can change their minds at any time before placement of the pre-embryos, while simultaneously protecting contractual interests between donors and clinics. *Id.*

¶83 Some of those jurisdictions that purport to adopt a balancing test still recognize the dangerous implications of forcing a non-consenting donor to procreate. For example, the New Jersey Supreme Court found that implantation could have "life-long emotional and psychological repercussions." *J.B. v. M.B.*, 783 A.2d 707, 717 (N.J. 2001). Because of these significant concerns, the court held that disposition agreements were subject to revision "up to the point of use or destruction of any stored preembryos." *Id.* at 719. If that occurred, the court would look to "the interests of both parties," but nevertheless reasoned that "ordinarily the party choosing not to become a biological parent will prevail." *Id.* Thus, although the New Jersey Supreme Court seems to adopt a balancing test like the majority's here, it still recognizes the significant costs of doing so and presumes that the right to not procreate would triumph in most circumstances.

¶84 Even the *Davis* court, which endorsed and spearheaded the balancing test approach to pre-embryo disputes, noted that "decisional authority rests in the gamete-providers alone." *Davis v. Davis*, 842 S.W.2d 588, 602 (Tenn. 1992). Therefore, "no other person has an interest sufficient to permit interference with the gamete-providers' decision to continue or terminate the IVF process, because no one else

4

bears the consequences of these decisions in the way that gamete-providers do." *Id.* Adopting the contemporaneous mutual consent approach would ensure that "gamete-providers alone" make the "decision to continue or terminate the IVF process." *Id.*

## A. Protection Against Constitutional Harm

¶85     Yet what exactly is it that the contemporaneous mutual consent test guards against? True, it keeps the courts from intruding on a donor's constitutional right to not procreate. But to properly understand this right, we must see what types of harms a violation of it would engender. This is vital given that, even if a court were to award the pre-embryos to Ms. Rooks, Mr. Rooks will not become the legal parent of Ms. Rooks's eventual children. *See* 19-4-106(7)(a), C.R.S. (2018) (allowing an ex-spouse to withdraw consent to legal parentage); *see also infra* Section II.B. So, how will Mr. Rooks be harmed by a decision granting Ms. Rooks the pre-embryos given that he will have no legal responsibilities to his genetic children?

¶86     For the non-consenting donor, there are several harms that may be inflicted, each of which derives "from the unwanted existence of a child to whom one stands in relationship of parent." *See* I. Glenn Cohen, *The Right Not to Be a Genetic Parent?*, 81 S. Cal. L. Rev. 1115, 1135 (2008). While Mr. Rooks will not be the legal or (obviously) the gestational parent, he will still have some residual, societal parenthood attached to him by both the nature of his previous relationship with Ms. Rooks and his genetic tie to the child.

5

¶87    First, how is Mr. Rooks to respond when someone tells him how brilliant or troubled his new daughter is growing up to be? *See id.* at 1136. Should he be required to explain that he is not the child's legal parent and that he only became a genetic parent over his objection? Or must he simply smile and nod? Either one is a constitutional harm against which the right to not procreate protects. But the majority's test may very well require the state to inflict these harms.

¶88    Second, Ms. Rooks's resulting child could, quite understandably, perceive Mr. Rooks as her father, irrespective of the legal technicalities we discuss today. *See id.* Adopted children and children born of sperm donors sometimes seek out their genetic parents. *Id.* There is no guarantee that the new child will not discover and want to explore her genetic circumstances. Mr. Rooks then must endure another constitutional harm: the potential for pressure to be placed on him by his unwanted genetic child.

¶89    Third, Mr. Rooks, himself, may view the resulting child as his own, even though the law does not recognize him as the parent. *See id.* at 1137. Presumably, a consenting spouse does not view a child born from IVF as his or her own simply because the law bestows legal parentage. Rather, it is more typically the social and genetic tie that causes the spouse to care for and love the child. But both are still present in the case of the non-consenting former spouse. And that former spouse is stuck with the "powerful attendant reverberations of guilt, attachment, or responsibility which . . . knowledge [of the resulting child] can ignite." John A. Robertson, *In the Beginning: The Legal Status of*

*Early Embryos*, 76 Va. L. Rev. 437, 479 (1990). It seems reasonable to infer that, if Mr. Rooks didn't fear such reverberations, we probably wouldn't be here today.

¶90 As each of these examples demonstrates, the majority's test permits the state to use its power to inflict constitutional harm. Citizens are meant to be "free from unwarranted governmental intrusion" when deciding "whether to bear or beget a child." *Eisenstadt*, 405 U.S. at 453. But instead of unfettering citizens, the majority's test places the state directly between two people in a decision that "fundamentally affect[s]" their lives. *Id.* It is true that some harm is suffered by the parent wanting to procreate under the contemporaneous mutual consent approach.

¶91 [1] The crucial difference is that the state has no role in perpetrating it. Ms. Rooks has the right to be free from "unwarranted governmental intrusion" in exercising her right to procreate. *Eisenstadt*, 405 U.S. at 453. She does not have the right to compel genetic procreation against another person's will.

## B. Colorado Statutory Scheme

¶92 That the state should avoid inflicting constitutional harms on its citizens should be enough to caution this court away from adopting any sort of test that forces it to choose sides. If that concern is insufficient, a portion of the Colorado Uniform Parentage Act,

---

[1] Indeed, the donor wishing to implant would be required to "try again," with all its attendant monetary costs and physical invasions. In some cases, a donor may lose the ability to have more children or any children at all. These harms are real. But under the contemporaneous mutual consent approach, they are not inflicted by the state.

specifically section 19-4-106(7)(b), arguably codifies the contemporaneous mutual consent approach. At the very least, this statutory provision sheds light on the policy preference of the Colorado General Assembly. Subsection (7) reads, in whole, as follows:

> (7)(a) If a marriage is dissolved before placement of eggs, sperm, or embryos, the former spouse is not a parent of the resulting child unless the former spouse consented in a record that if assisted reproduction were to occur after a dissolution of marriage, the former spouse would be a parent of the child.
>
> (b) The consent of a former spouse to assisted reproduction may be withdrawn by that individual in a record at any time before placement of eggs, sperm, or embryos.

§ 19-4-106(7).

¶93 Subsection (7)(b) seems to embrace the contemporaneous mutual consent approach, stating that a former spouse maintains the power to veto assisted reproduction at any point before placement of the pre-embryo.

¶94 The majority argues that (7)(b) should be read to modify (7)(a), referring to the same "consent" as in (7)(a), or consent to be a legal parent, not consent to placement. Maj. op. ¶¶ 51–52. Under the majority's reading, (7)(a) permits a former spouse to consent to be a legal parent, and (7)(b) empowers a former spouse who has previously given that consent to withdraw it. *Id.*

¶95 I am not persuaded by the majority's limited reading. As I see it, the two subsections describe precisely the type of consent at issue for each subsection. And the two types of consent are different. Subsection (7)(a) frames the consent in more narrow language, "that if the assisted reproduction were to occur after the dissolution of

8

marriage, the former spouse would be a parent of the child." § 19-4-106(7)(a). In contrast, the "consent" in (7)(b) is framed more broadly as consent "to assisted reproduction." § 19-4-106(7)(b). Thus, I read subsection (7)(a) to encompass consent to be a legal parent, whereas I read subsection (7)(b) to refer generally to consent to have one's genetic material used in assisted reproduction.

¶96 My reading ensures that no portion of the statute is rendered superfluous. *See Wolford v. Pinnacol Assurance*, 107 P.3d 947, 951 (Colo. 2005) ("[W]e must interpret a statute to give effect to all its parts and avoid interpretations that render statutory provisions redundant or superfluous."). Subsection (8) contains language nearly identical to subsection (7)(a): "If a spouse dies before placement . . . the deceased spouse is not a parent . . . unless the deceased spouse consented . . . ." §19-4-106(8).[2] Subsection (8), however, does not contain a subsection (7)(b) equivalent. *Id.* Even without a subsection (8)(b), the natural implication of subsection (8)'s language is that a spouse could revoke consent prior to death and ensure that no legal parentage posthumously results. Any other interpretation would leave the deceased spouse's estate at the whims of the surviving spouse's posthumous procreational decisions. Thus, I read subsection (8) to authorize a spouse to both give and revoke consent prior to death. And because

---

[2] The full text reads: "If a spouse dies before placement of eggs, sperm, or embryos, the deceased spouse is not a parent of the resulting child unless the deceased spouse consented in a record that if assisted reproduction were to occur after death, the deceased spouse would be a parent of the child." § 19-4-106(8).

9

"identical words used in different parts of the same act are intended to have the same meaning," subsection (7)(a) must be read correspondingly. *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994).

¶97    Reading subsection (7)(a) consistently with subsection (8) means that subsection (7)(a) must also allow for the withdrawal of consent to be a legal parent. If subsection (7)(a) and subsection (8) are not both construed to authorize withdrawal of consent to be a legal parent, we wouldn't be giving "identical words . . . the same meaning." *Id.* But because subsection (7)(a) already provides a process for withdrawing such consent—as the previous paragraph demonstrates it must—then subsection (7)(b) must do something different to avoid becoming "mere surplusage." *Colo. Med. Bd. v. Office of Admin. Courts*, 2014 CO 51, ¶ 19, 333 P.3d 70, 74. What subsection (7)(b) does differently is clear from its plain text: It empowers a former spouse to withdraw consent to assisted reproduction.[3]

---

[3] It is worth noting that the comment to the subsection (7) equivalent of the Uniform Parentage Act ("UPA") states that the UPA does not attempt to resolve issues regarding disputed pre-embryos, but leaves such decisions to the states. Unif. Parentage Act § 706 cmt. (Nat'l Conference of Comm'rs on Unif. State Laws 2002). However, the comment to section 707, the subsection (8) equivalent, does state that section 707 seeks to avoid posthumous effects on intestate succession. *Id.* § 707 cmt. Thus, even though the framers of the UPA did not attempt to explicitly resolve pre-embryo disputes, they did insert language for deceased spouses that does allow for the withdrawal of consent, and subsequently used that same language for former spouses. This, at a minimum, demonstrates that the UPA framers knew that the section 706 language was capable of an interpretation that pertained to pre-embryo disputes. And, given that our General Assembly wanted to ensure that IVF consent laws are "balanced and fair," and sought to address "all . . . contingencies" regarding withdrawal of consent, the UPA comment to section 706 is inapposite to a proper interpretation of the Colorado statute. *See* Hearings on S.B.03-79 before H. Comm. on Info. & Tech., 64th General Assembly (Mar. 17, 2003).

¶98     The majority suggests that the General Assembly's use of "resulting child" renders this reading implausible. Maj. op. ¶ 54. But the "resulting child" language that the majority relies on is from sections 15-11-120(9) and (10), C.R.S. (2018), of the Colorado Probate Code and subsection (7)(a). It does not appear in subsection (7)(b). Its absence in subsection (7)(b) is central to understanding the statutory scheme. Subsection (7)(a) refers to the narrower consent relevant in divorce proceedings where consent to assisted reproduction has not been withdrawn. It simply enables ex-spouses to amicably choose to continue with IVF without a former spouse becoming a legal parent.

¶99     The Colorado Probate Code, however, deals with situations where ex-spouses or now-deceased spouses are unable to withdraw their consent (unless they happened to do so in a will or other instrument). *See* § 15-11-120(9)–(10). In fact, the sections that the majority quotes come from that act's "intestate succession" provisions. Thus, these sections, which refer to a "resulting child," just ensure that a deceased spouse or ex-spouse, who is unable to withdraw consent to assisted reproduction, does not bear posthumous legal children. That's also why the "resulting child" language is used in subsection (8). The "resulting child" language appears exactly where it makes sense to appear—where a child could still result from IVF, either because consent has already been given or because someone is physically unable to withdraw consent.

¶100    Conspicuously absent is any "resulting child" language in subsection (7)(b), which deals directly with consent to assisted reproduction. The language isn't there because there's no reason for it to be. If a former spouse withdraws consent, then there

11

is no resulting child. It would make little sense to place such language in a provision that prohibits a former spouse from implanting pre-embryos in the first place.

¶101 Even if one might question whether the General Assembly intended to create a contemporaneous mutual consent rule in subsection (7)(b), that does not give us license to craft a test that inflicts constitutional harm. If the General Assembly has not embraced the contemporaneous mutual consent rule, as the majority contends, courts should still steer away from decisions that compel procreation. *See* Maj. op. ¶ 55.

¶102 So, mutual consent is essential. This begs the question of when the mutual consent must occur for it to be binding.

## C. When Must Both Parties Consent?

¶103 Some proponents of other approaches argue that the parties consent when they allow the sperm and eggs to be harvested and united. This strikes me as simplistic, as it suggests that a party supplying an egg or sperm for IVF forever consents to becoming a genetic parent. Instead, parties should be allowed to withdraw consent until the last point at which an additional affirmative step must be taken in the IVF process in order to produce a child. Before placement, both parties should retain veto power. From a practical point, to hold otherwise would suggest that a person who provides sperm or eggs during IVF consents to procreate as to each and every sperm or egg harvested at any point in the future. As the amicus brief for the American Academy of Matrimonial Lawyers states, eight to twenty-five eggs are often harvested at a time. Amicus Br. Colorado Chapter of the American Academy of Matrimonial Lawyers 4–5. Imagine

12

twenty-five eggs are successfully fertilized. Do we really want to say that partners who agree to IVF thereby forever consent to genetically parent all children resulting from successful implantation of any of those pre-embryos? My answer is no.

## D. The Contemporaneous Mutual Consent Approach Advances Public Policy

¶104 While the constitutional right of a person to not procreate should drive this discussion, I note that the contemporaneous mutual consent approach advances sound public policy. First, I address the two critiques of this model that the majority highlights. Maj. op. ¶ 46. Then I address the inevitable difficulty that courts will have in applying the majority's test to the numerous situations in which these disputes could arise.

¶105 The majority describes how some find the contemporaneous mutual consent approach unrealistic. After all, they say, if the parties could reach an agreement, they would not be in court. *Id.* But this pragmatic observation ignores another: After the dissolution of a marriage, rancor typically subsides. However unlikely it might seem that these parties will eventually reach agreement about these pre-embryos, common ground might not prove so elusive in other cases, particularly with the passage of time after dissolution. Moreover, by adopting the contemporaneous mutual consent model, the parties do leave the divorce process with some resolution. If there is no agreement, there is no change. The status quo is simply preserved. And that is a resolution that will engender far less contentiousness and potentially wrenching litigation. *Cf.* § 14-10-102(2)(b), C.R.S. (2018) (noting that one of the underlying purposes of the

13

Uniform Dissolution of Marriage Act is to mitigate the potential harm to spouses and their children caused by the process of legal dissolution of marriage).

¶106 The majority also points out that some argue the contemporaneous mutual consent approach would give one partner undue leverage in divorce proceedings. Maj. op. ¶ 46. For example, a husband might use a wife's desire for pre-embryos to obtain a more beneficial outcome on division of assets or debt, or allocation of parental responsibilities as to existing children of the marriage. While this is a legitimate concern, surely it is better to let trial courts address the potential for such misbehavior on an ad hoc basis through the vast discretion trial courts have under the Uniform Dissolution of Marriage Act rather than to endow courts with the authority to violate a person's constitutional right to avoid procreation.[4] The majority approves of the trial court's

---

[4] Colorado's Uniform Dissolution of Marriage Act (UDMA), §§ 14-10-101 to -133, C.R.S. (2018), provides trial courts the power to make certain "inextricably intertwined" determinations related to a dissolution of marriage, including property distribution, maintenance, and attorney fees. *See In Re Marriage of de Koning*, 2016 CO 2, ¶ 26, 364 P.3d 494, 498 (describing how "awards of spousal maintenance and attorney's fees flow from the property distribution"). In making the required determinations after a contested hearing, trial courts have latitude to ensure a just resolution. *See, e.g.,* § 14-10-114(3)(c)(XIII) (stating that courts should determine an amount of spousal maintenance that is fair and equitable after considering relevant factors, including "[a]ny other factor that the court deems relevant"); *In re Marriage of Aldrich*, 945 P.2d 1370, 1378 (Colo. 1997) ("The district court then apportions [attorney] fees and costs in light of the statute's equitable purpose . . . ."). And for some decisions, the legislature has expressly directed the trial court to consider a parent's behavior as related to children and the other party. *See* § 14-10-124(1.5)(a)(VI) (listing one factor for the court to consider when determining the best interest of the child as "[t]he ability of the parties to encourage the

discretion to do so, as their balancing test explicitly requires courts to look at "a spouse's demonstrated bad faith or attempt to use the pre-embryos as unfair leverage in the divorce proceedings." Maj. op. ¶ 4.

¶107 Whatever the shortcomings of the contemporaneous mutual consent approach, it remains a workable test that keeps donors free from governmental intrusion. For example, the court need not enter the fray as to whether a person is capable of genetically reproducing, as the majority's approach requires. *Id.* That is no small matter. Consider that here Ms. Rooks alleged in the lower courts that she could not procreate without use of these pre-embryos, only to discover during the course of her appearance before us that she could.

¶108 Or consider the amorphous requirement to look to the "hardship" of the spouse seeking to avoid becoming a genetic parent, which includes "emotional, financial, or

---

sharing of love, affection, and contact between the child and the other party"). In the event that parties are able to reach an out-of-court settlement and present a separation agreement to the court, the court still has the ability to review the agreement for unconscionability. *See* § 14-10-112(2). "If the court finds the separation agreement unconscionable, the court may request the parties to submit a revised separation agreement, or the court may make orders for the disposition of property, support, and maintenance." § 14-10-112(3); *see also In re Marriage of Manzo*, 659 P.2d 669, 674 (Colo. 1983) (describing that before the court incorporates the property division provisions of a separate agreement into a dissolution decree, the court should review the agreement for "sharp dealing not consistent with the obligation of marital partners to deal fairly with each other" and determine "whether under the totality of the circumstances the property disposition is fair, just and reasonable"). It follows, then, that when one party tries to use pre-embryos as an unfair negotiating tool, the trial court would be able to intervene through the various provisions of the UDMA to ensure a just result.

15

logistical considerations." *Id.* Which "emotional" factors are relevant? And in which direction should such factors cut? The majority cites favorably *Davis*, which considered the ex-husband's childhood experiences involving divorce. *Id.* at ¶ 68 (citing *Davis*, 842 S.W.2d at 603–04). Is the court now to probe the intimate early childhood experiences of non-consenting donors just so they can avoid being compelled to produce genetic offspring? These factors leave too much undecided—particularly because the majority expressly makes the list of factors in the balancing test "non-exhaustive." Maj. op. ¶ 65. Rather than limiting litigation, the majority invites predictable appeals. Inevitably, the losing party will appeal and claim that the lower court misapplied the relevant factors, further enmeshing the government.

### III. Conclusion

¶109 The decision to have children is one of the most consequential choices people make in life. The considerations that go into it are numerous and personal; it is not a decision that most would leave to their dearest friends, let alone the state. It is difficult, if not impossible, for a court to properly determine whose constitutional rights should prevail in cases like the one before us. Sometimes courts are left with no choice but to balance and choose competing constitutional rights. But here, where the decision is ultimately a private one between two people, the court need not get involved. Only once the court involves itself is there any constitutional violation. Up to and until that point, it is an intimate, personal decision.

¶110 Because the contemporaneous mutual consent approach better protects the constitutional rights at stake, aligns with Colorado law, and is more sound as a matter of policy, I respectfully dissent.

I am authorized to state that CHIEF JUSTICE COATS and JUSTICE SAMOUR join in this dissent.