*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SARAH MARIE MARKIEWICZ,

       Plaintiff-Appellant,

v

DAVID RANDAL MARKIEWICZ,

       Defendant-Appellee.

UNPUBLISHED
December 7, 2023

No. 363720
Macomb Circuit Court
LC No. 2019-003236-DM

Before: CAVANAGH, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

In this postjudgment divorce proceeding, plaintiff, Sarah Markiewicz, appeals as of right the trial court's order awarding the parties' cryogenically-preserved embryo to defendant, David Markiewicz.[1] We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties married in 2009, and had four children during their marriage.[2] Because the couple experienced fertility issues, their first child was conceived through an *in vitro* fertilization (IVF) process using Sarah's sister's egg and David's sperm. The second child was conceived naturally. And the third and fourth children (twins) were conceived through IVF, again using Sarah's sister's egg and David's sperm. During the IVF process with the twins, the parties had

---

[1] This case returns to this Court after our remand in *Markiewicz v Markiewicz*, unpublished per curiam opinion of the Court of Appeals, issued March 24, 2022 (Docket No. 355774).

[2] When the judgment of divorce was finalized in 2020, the oldest child was eight years old, the next child was seven years old, and a pair of twins were four years old.

three embryos at their disposal. They chose to proceed with implanting two of them in Sarah and cryogenically preserved the last one.[3] The two they chose were the most viable of the three.

In 2019, Sarah filed for divorce. In October 2020, the parties were able to resolve all issues, except for the disposition of the remaining frozen embryo, and entered into a consent judgment of divorce. In the initial lower court proceedings, Sarah argued that she should receive the embryo because it likely was her "last chance to have children if she so chooses." David argued that he simply did not want another child, and he did not want another child to be born from his DNA. *Markiewicz v Markiewicz*, unpublished per curiam opinion of the Court of Appeals, issued March 24, 2022 (Docket No. 355774), p 2. During those proceedings, Sarah's counsel unequivocally asserted that the embryo was "marital property." *Id*. David's counsel was not sure that the embryo was marital property because, as between the two parties, only David had contributed biologically to the embryo, making it "more his than hers." The trial court agreed with Sarah and ruled that the embryo was marital property. But after evaluating the equities, the court awarded the embryo to David.

Sarah appealed the trial court's decision to this Court. In pertinent part, this Court rejected her argument that the trial court erred by categorizing the embryo as marital property. This Court found that Sarah was "judicially estopped from challenging the classification of a frozen embryo as property" because she had "unequivocally and successfully argued that the embryo was marital property" in the lower court proceedings. *Id*. at 4. Because the embryo was marital property, this Court stated that the *Sparks*[4] factors must be considered in dividing the marital property. *Id*. at 5. Additionally, this Court determined "that a frozen embryo deserves special respect because of its unique potential for human life. As a result, any disposition of a frozen embryo must start with the recognition that, even when a frozen embryo is treated as property, it nevertheless may one day develop into a born child." *Id*. at 8.

This Court recognized that other states generally use one of three different approaches to decide how the disposition of frozen embryos are to be undertaken after a divorce: the contemporaneous mutual consent approach, the contractual approach, and the balancing approach. *Id*. This Court summarized the different approaches as follows:

> Under the contemporaneous mutual consent approach, the pre-embryos must remain in storage until the parties agree to a disposition. *Bilbao v Goodwin*, 217 A3d 977, 985 (Conn, 2019); *In re Marriage of Witten*, 672 NW2d 768, 777-778 (Iowa 2003). If they cannot agree, then the status quo is maintained, and "the pre-embryos remain in storage indefinitely." *Bilbao*, 217 A3d at 985. The contractual approach provides that a pre-existing agreement between the parties regarding the disposition of preserved pre-embryos is "presumed valid and enforceable." See, e.g., *id*. at 984, 992 (determining that the parties had an enforceable agreement); *Kass v Kass*, 91 NY2d 554; 673 NYS2d 350; 696 NE2d 174, 179 (1998) (holding

---

[3] Cryopreservation is a freezing process. After the embryo is frozen, it is maintained in frozen storage.

[4] *Sparks v Sparks*, 440 Mich 141, 159-160; 485 NW2d 893 (1992).

that the parties' agreement controlled). The balancing approach requires a circuit court to weigh the parties' respective interests in the pre-embryos. *Bilbao*, 217 A3d at 985.

The exceedingly rare mutual consent approach is disfavored. See, e.g., *Jocelyn P v Joshua P*, 250 Md App 435; 250 A3d 373, 405 (2021); *In re Marriage of Rooks*, 429 P3d 579, 592 (Colo, 2018); *Reber v Reiss*, 42 A3d 1131, 1136 (Pa Super Ct, 2012). But see *Witten*, 672 NW2d at 783 (using this approach); cf. *McQueen*, 507 SW3d at 145-147 (affirming award of joint ownership to both of the spouses using the balancing approach). Most jurisdictions that have considered the approach have held it to be impractical and unworkable. See, e.g., *Jocelyn P*, 250 A3d at 405; *Rooks*, 429 P3d at 592; *Reber*, 42 A3d at 1136. As the Colorado Supreme Court persuasively explained, "[i]t is . . . unrealistic to think that parties who cannot reach agreement on a topic so emotionally charged will somehow reach resolution after a divorce is finalized." *Rooks*, 429 P3d at 592.

In contrast, the contractual approach, which recognizes the validity of a contract between the parties as governing the disposition of preserved pre-embryos, is embraced by the majority of jurisdictions that have addressed the issue. See *Jocelyn P*, 250 A3d at 381; *Bilbao*, 217 A3d at 986, 992; *Szafranski v Dunston*, 393 Ill Dec 604; 34 NE3d 1132, 1147 (Ill App Ct, 2015); *In re Marriage of Dahl & Angle*, 222 Or App 572; 194 P3d 834, 840 (2008); *Roman v Roman*, 193 SW3d 40, 48 (Tex App, 2006); *Kass*, 673 NYS2d 350; 696 NE2d at 180; *Davis v Davis*, 842 SW2d 588, 598 (Tenn, 1992), petition to rehear granted in part, No. 34, 1992 WL 341632 (Tenn, 1992) (per curiam). But see *Witten*, 672 NW2d at 781 (rejecting this approach); *AZ v BZ*, 431 Mass 150; 725 NE2d 1051, 1057 (2000) (noting that it would not uphold an agreement between the parties if it "would compel one donor to become a parent against his or her will").

In the absence of such an agreement through contract, courts commonly use the third approach, which balances the parties' competing interests. See, e.g., *Jocelyn P*, 250 A3d at 380; *Rooks*, 429 P3d at 593-594; *Davis*, 842 SW2d at 603-604. [*Markiewicz*, unpub op at 8-9, quoting *Jessee v Jessee*, 74 Va App 40, 52-53; 866 SE2d 46 (2021).]

The *Markiewicz* Court rejected the contemporaneous mutual consent approach because it is "inherently impractical." *Markiewicz*, unpub op at 9. Instead, this Court adopted a blended approach that "requires courts to first look to see if there is a valid agreement between the parties addressing the disposition of the embryo. In the absence of such an agreement, the court must then 'balance the interests of the parties to determine disposition of the frozen pre-embryos.' " *Id.*, quoting *Jocelyn P*, 250 Md App at 479. This Court recognized that the balancing of the parties' interests will require consideration of many factors, including (1) "the original reasons that the parties underwent IVF treatment," (2) "the parties' positions related to the disposition of the embryo," (3) "whether the party seeking procreation would have any other reasonable means of achieving parenthood were the embryos at issue to be destroyed," (4) as "to the party seeking to destroy an embryo, it is appropriate to consider the implications of imposing unwanted parenthood on that party, including possible financial and psychological consequences of doing so," and (5)

the presence of any "party's bad faith and attempt to use the frozen pre-embryos as leverage in the divorce proceeding." *Markiewicz*, unpub op at 9-10 (cleaned up).

Because the trial court rendered its original decision without "the benefit of this legal framework," this Court vacated the trial court's decision and remanded for it to perform the proper analysis. *Id*. at 10-11. Specifically, this Court directed that

> the trial court shall consider the applicable *Sparks* factors. With regard to the additional relevant factor identified in this opinion, i.e., the special nature of the embryo, the trial court should first consider whether the disposition of the embryo is governed by a valid contract between the parties. If such a contract exists, the matter should be concluded in accord with the contractual terms that the parties agreed upon in that contract. If there is no contract, then the court must balance the interests of the parties using the framework stated in this opinion. In doing so, the trial court may again consider the facts—as argued below—that Sarah has already bore four children with David; that the egg used to produce the embryo was not Sarah's, but her sister's; and that Sarah offered to include language in the judgment of divorce indicating that David would have no financial obligations related to any child born as a result of the embryo being implanted. With regard to the remaining *Sparks* factors, additional factors, such as the ages and health of the parties, may also be relevant and should be addressed. Financial considerations may also be considered. The cost of the IVF process is ascertainable. Therefore, it would be appropriate to consider the costs Sarah would incur were she to obtain another embryo using IVF techniques should the court again decide that it is equitable to award the existing embryo to David. [*Id*.]

On remand, the trial court held an evidentiary hearing at which only Sarah and David testified. The parties stipulated to the admission of, among other things, their agreement with the cryopreservation storage facility, wherein the parties agreed that (1) in the event of the death of one of them, any remaining embryos would be transferred to the surviving party as sole owner; (2) in the event of the death of both parties, any remaining embryos would be given to Sarah's sister, who was the donor of the egg; and (3) in the event of divorce, the disposition of any frozen embryos would be "[d]etermined by the applicable Judgment of Divorce or other court order."

At the time of the hearing, Sarah was 44 years old and was postmenopausal. The parties agreed that the cost of a full cycle of IVF is approximately $15,000. Sarah testified that she and David initially embarked on IVF treatment because of infertility issues. She stated that she would have the last embryo implanted in her if it was awarded to her. If she had such a child, she would not seek any financial support from David and would agree to waive any obligations on his part. Sarah acknowledged that if she were not awarded the embryo, she could get a donor egg and sperm from other people. However, she maintained that this embryo represented her last opportunity to have a child that is "closest" genetically to the couple's twins. Sarah testified that she currently is working part time and that after daily expenses, "[t]here's not that much extra." But she noted that she is "making it through" and "hopefully" would be going to full-time employment in the next couple of months. She testified that, if she were awarded the embryo, she would not have it implanted until she was employed full-time. Notably, no evidence was introduced regarding Sarah's religious views.

David testified that although he was more of the breadwinner while the parties were married, the parties nonetheless equally contributed to the household. David stated that he does not want any more biological children, especially with Sarah now that they are divorced. He maintained that he wants the embryo because it is his genetic property, not Sarah's. And if the embryo was awarded to him, he would donate it to science or have it discarded. David explained that if Sarah were awarded the embryo and she had a child with it, he would suffer mental anguish knowing he had a biological child to whom he would have no access or rights. David reiterated that if Sarah desired to have more children, nothing was preventing her from accomplishing that through obtaining other donor eggs, including possibly from her sister.[5]

The trial court accepted, without deciding, that Sarah could waive child support. The court also noted that it was settled that the embryo was marital property, but that it was to be given special consideration in light of the nature of the property. The court found that the parties' Embryo Cryopreservation Agreement did not control the outcome in this case because it simply allowed a court to decide in the event of a divorce.

The trial court therefore balanced the interests of the parties. For the "normal property factors," the court dispensed with most of them as not relevant or neutral, but found that Sarah's age,[6] the past relations and conduct of the parties, and general principles of equity were relevant. The court noted that the original reason for why the parties underwent IVF treatment was to address their infertility issues and to have a family. Regarding the parties' current positions related to the disposition of the embryo, the court recognized that David wanted to avoid procreation and that Sarah wanted to preserve her ability to potentially have a child in the future. Regarding whether there were any alternate means of achieving parenthood, the court indicated that the testimony indicated that Sarah could do that.

The trial court also considered the implications of imposing unwanted parenthood on David, noting that David indicated he would not feel right having a biological child without having a parental role. Regarding whether there was any bad faith by any party to use the frozen embryo as leverage in the divorce proceedings, the court found that there was none. When balancing the interests of the parties, the court noted that the embryo was made using Sarah's sister's egg and David's sperm. Consequently, the court found that there was no escaping the logical conclusion that the embryo was "more his than hers." Additionally, because Sarah had other options if she wanted to have more children, that factor weighed in favor of David. The court added that the fact that Sarah already had four children was irrelevant and did not weigh against her.

---

[5] Sarah was of the opinion that her sister was now too old to donate eggs because "[u]sually they [presumably, the doctors] recommend" the donor to be 25 years of age or younger. However, there was no expert testimony or other evidence introduced establishing whether Sarah's or David's opinion was more accurate. But Sarah's testimony was couched as describing a preference that was "usual" and a "recommendation," which by its terms would not be exact or controlling.

[6] The court noted that Sarah's age and the fact that she was postmenopausal was relevant because she could not naturally conceive children.

In the final analysis, the court determined that, based on these facts, awarding the embryo to Sarah would be more inequitable to David, compared to the inequity Sarah would suffer if the embryo were awarded to David.

Sarah moved for reconsideration, arguing that the trial court did not properly consider the parties' Embryo Cryopreservation Agreement, the parties' religious beliefs, and David's ability to have the frozen embryo carried by a surrogate. The trial court denied the motion. Sarah now appeals.[7]

## II. EFFECT OF CONSTITUTIONAL AMENDMENT

Sarah first argues that a remand is necessary to allow the trial court to consider the ramifications of Const 1963, art 1, § 28, which was ratified by the voters of this state after the trial court rendered its decision. We disagree.[8]

The trial court held an evidentiary hearing on September 28, 2022, and rendered its decision on October 5, 2022, which was effectuated in an order entered on October 7, 2022. On November 8, 2022, the people of the state of Michigan approved amending our Constitution by adding, in part, the following provision:

> (1) Every individual has a fundamental right to reproductive freedom, which entails the right to make and effectuate decisions about all matters relating to pregnancy, including but not limited to prenatal care, childbirth, postpartum care,

---

[7] This Court granted a stay pending appeal. *Markiewicz v Markiewicz*, unpublished order of the Court of Appeals, entered January 4, 2023 (Docket No. 363720).

[8] Generally, a party must raise an issue in the lower court for it to be preserved for appellate review. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). There is no dispute that Sarah never raised this issue in the trial court because the Constitutional amendment at issue was not approved by the voters until November 2022, and did not become effective until December 2022, both of which occurred after the trial court rendered its initial decision and its decision denying Sarah's motion for reconsideration. Thus, the issue typically would be considered unpreserved, which would waive any review. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359090); slip op at 5.

However, because it was impossible for Sarah to have raised this issue before the trial court rendered its decision, we exercise our discretion to overlook the strict preservation requirements. "[T]his Court may overlook preservation requirements if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented[.]" *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006). Whether the Constitutional amendment, which was passed after the trial court made its decision, has any effect or bearing in this case is a question of law, and any facts necessary for that determination have been presented.

contraception, sterilization, abortion care, miscarriage management, and infertility care.

An individual's right to reproductive freedom shall not be denied, burdened, nor infringed upon unless justified by a compelling state interest achieved by the least restrictive means.

\* \* \*

(2) The state shall not discriminate in the protection or enforcement of this fundamental right. [Const 1963, art 1, § 28.]

Although approved in the November 2022 general election, this Constitutional amendment was not effective until December 24, 2022.

The primary issue to resolve is whether § 28 has any effect on these proceedings. The first aspect to consider is the impact of the December 24, 2022 effective date. Although § 28 did not become effective until more than two months after the trial court decided this matter, Sarah, without citing any authority, asserts that because it became effective "during the life of the appeal," it must be considered. Even in reply to David's argument that § 28 is not applicable to this case because it did not exist when the trial court made its decision, Sarah cites no authority for essentially giving retroactive effect to § 28. Instead, she merely contends that § 28 vested the people of Michigan with these rights and the trial court should consider those rights. But see *People v Gornbein*, 407 Mich 330, 334; 285 NW2d 41 (1979) ("As a general rule, constitutional amendments operate prospectively and not retroactively."). Given Sarah's failure to cite any authority supporting her position that § 28 may be applied retroactively to this dispute, that issue may be considered abandoned. See *Johnson v Johnson*, 329 Mich App 110, 126; 940 NW2d 807 (2019).

In any event, we are not persuaded that § 28 has any effect on the outcome of these proceedings. Sarah claims that § 28 vested both her and David with fundamental rights, which must be considered by the trial court. Assuming such vested rights existed, it is manifestly clear that they would not lead to any different result. Significantly, the trial court did not disagree that either party had the right to make decisions relating to pregnancy or childbirth, and its decision did not infringe on how the parties could exercise any such rights. Rather, the dispute in this case involved the disposition of a frozen embryo, which was deemed marital property in which both parties had competing rights. Even if § 28 applied, the court still would be required to consider the competing views from Sarah and David, and decide whose "rights" to the disposition of the embryo were to be vindicated and whose "rights" were to be impaired.

Further, Sarah's argument that strict scrutiny would apply to impair any rights is not applicable in this case. Strict scrutiny is only applicable when the *state* seeks to impair any constitutional rights. See *Barrow v City of Detroit Election Comm*, 301 Mich App 404, 420; 836 NW2d 498 (2013) ("Under a strict scrutiny analysis, the *government* may not infringe upon a fundamental liberty interest unless the infringement is narrowly tailored to serve a compelling state interest.") (emphasis added). In this case, the state is not attempting to take or curtail any action, which involves a private dispute between Sarah and David. Because the parties divorced, the court

necessarily was required to decide, under equitable principles, how the marital property, including the frozen embryo, was to be divided between the two of them. Attributing "rights" to divorced parties would not change a court's analysis.[9] When faced with competing and diametrically opposed interests, a court necessarily will have to balance the parties' competing interests, which is the process this Court outlined and ordered the trial court to follow. *Markiewicz*, unpub op at 9-11. Accordingly, even assuming that § 28 had any application in this case, we fail to see how remanding for the trial court to consider these rights would yield any different result.

### III. TRIAL COURT'S FINDINGS AND DECISION TO AWARD EMBRYO TO DAVID

Sarah argues that the trial court erred in its application of this Court's decision in *Markiewicz*, and by awarding the embryo to David. We disagree.

This Court reviews the trial court's factual findings for clear error. *Sparks*, 440 Mich at 151. A reviewing court is to then decide if, in light of those facts, the trial court's division of property was fair and equitable. *Id*. at 151-152. That dispositional ruling is to be affirmed unless this Court is left with a firm conviction that the property division was inequitable. *Id*. at 152. But the proper interpretation of a contract is a question of law that this Court reviews de novo. *Reed v Reed*, 265 Mich App 131, 141; 693 NW2d 825 (2005).

In *Markiewicz*, unpub op at 9, this Court held that

> disputes that arise during a divorce regarding the disposition of a frozen embryo should be decided using a blend of the contractual approach and the balancing approach. This blended approach requires court to first look to see if there is a valid agreement between the parties addressing the disposition of the embryo. In the absence of such an agreement, the court must then "balance the interests of the parties to determine disposition of the frozen pre-embryos." [Citations omitted.[10]]

Sarah first argues that the trial court erred by concluding that there "was no valid agreement." Sarah implies that the court found that there was no contract at all (countering that

---

[9] As an example, it is well established that parents have the constitutional right "to make decisions concerning the care, custody, and control of their children." *In re Sanders*, 495 Mich 394, 409; 852 NW2d 524 (2014); see also *In re Brock*, 442 Mich 101, 109; 499 NW2d 752 (1993); *In re VanDalen*, 293 Mich App 120, 132; 809 NW2d 412 (2011). Despite these constitutional rights, courts regularly "impair" the parents' rights by dividing the custody of the parties' children between the parties after a divorce, without undertaking any constitutional analysis, let alone strict scrutiny. See, e.g., *Thames v Thames*, 191 Mich App 299, 305; 477 NW2d 496 (1991) (stating that custody disputes in a divorce are to be resolved in the child's best interests).

[10] See also *Markiewicz*, unpub op at 10 ("[T]he trial court should first consider whether the disposition of the embryo is governed by a valid contract between the parties. If such a contract exists, the matter should be concluded in accord with the contractual terms that the parties agreed upon in that contract. If there is no contact, then the court must balance the interests of the parties using the framework stated in this opinion.")

"there was indeed a contract in the present case"), but that contention is not supported by the record. The trial court clearly acknowledged that the parties had entered into a contract with the storage facility. Additionally, the court reasoned:

> Now, was there a valid agreement between the parties regarding the disposition of the embryo[?] Well, it depends on what you mean by that. They agree[d] to enter a process. They [chose] which of three embryos to prioritize, because the other two were a better bet. Does that mean this one is non-viable[?] It doesn't mean that but the profile was not as good as the other two. Still potentially viable. Again, at the time is there an agreement[?] Well, there's an agreement to keep it in the game so to speak, to keep it viable, to kick the can down the road. So there's not an agreement at the time that it should either be used or not used. It's just a punt at the time. I think it is significant that while married while they're going through the process, . . . no positive step can be taken without both of them signing on to it. So it certainly can't be said that they had agreed to go forward, that's clear. Now it's I guess just as clear, well, they hadn't agreed to get rid of it in the event of the divorce. The bottom line agreement is if a divorce, which neither were contemplating at the time, the court decides. So I guess the long and short of it has to be there's not a meaningful valid agreement as to disposition of the embryo.

Sarah primarily relies on the following language in a preamble section of the parties' agreement with the storage facility in support of her argument that the parties intended that the embryo would be returned to her:

> I/we agree to elect to cryopreserve all viable embryo(s) not transferred that are created during an IVF cycle. The process of cryopreservation will be performed in the laboratory of Michigan Center IVF, PLLC. The cryopreserved embryo(s) will be transferred to the long term facility of Fertility Storage, Inc (FSI)[.] *It is my/our intention to have these embryos transferred back to my uterus in a later cycle.* [Emphasis added.]

Clearly, it was the parties' intent at the time of the IVF process to implant embryos in Sarah's uterus. They were married and trying to start or build a family. But that is not the controlling intent at issue here, and that expressed intent does not manifest what the parties intended to do with the embryos in the event of a divorce. The very next section of the agreement is entitled "Embryo Disposition" and provides the answer. That section lists several scenarios: (1) "[i]n the event of the death of 1 partner," the parties agreed to "[t]ransfer [the] embryos to the surviving partner as sole owner[;]" (2) "[i]n the event of the death of both partners," the parties agreed to appoint Sarah's sister "to be the sole owner of [the] embryos[;]" and, (3) "[i]n the event of a divorce," the parties agreed that disposition of the embryos would be "[d]etermined by the applicable Judgment of Divorce or other court order."

The agreement clearly contemplates that in the event of a divorce, a court, either through a judgment of divorce or through some other order, is to decide the proper disposition of any remaining, viable embryos. To the extent there is tension or conflict in the overriding intention to use and implant the embryos and this intention to have a court decide the disposition of any embryo

in the event of a divorce, specific clauses in contracts prevail over more general terms. *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 367 n 22; 817 NW2d 504 (2012); see also 11 Williston, Contracts (4th ed), § 32:10, pp 739-740. Accordingly, the only pertinent portion of the contract is the portion providing what the parties agreed would happen in the specific event of a divorce. To somehow give effect to the parties' overarching intent that was contemplated while they were married and trying to build a family would render nugatory the section on embryo disposition in the event of a divorce. Courts are to "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003).

We find that the trial court did not err by concluding that the contract, aside from allowing a court to decide what would happen to any embryos in the event of a divorce, did not specify how the court is to make that determination. And without any agreement regarding how a court should decide the disposition of an embryo in the event of a divorce, the trial court properly proceeded to address the various factors described in *Markiewicz*. To the extent Sarah claims that the existence of the agreement precludes going forward with the balancing test, that position is without merit. This Court directed: "This blended approach requires courts to first look to see if there is a valid agreement between the parties *addressing the disposition of the embryo*. In the absence of such an agreement, the court must then 'balance the interests of the parties to determine disposition of the frozen pre-embryos.' " *Markiewicz*, unpub op at 9 (citations omitted). The fact that there was a general agreement between the parties is not the question; the question is whether there was an agreement "addressing the disposition of the embryo" under the present circumstances, i.e., in the event of a divorce. And in this instance, because the agreement merely deferred to a court's determination, it cannot be considered an actual agreement regarding the embryo's disposition. The trial court rightfully recognized that "there's not a meaningful valid agreement as to disposition of the embryo."

Thus, with no meaningful agreement pertaining to the disposition of the embryo, the trial court properly proceeded to perform the balancing test as prescribed by this Court in *Markiewicz*.

Sarah next argues that the trial court erred by determining that to undertake any type of action with regard to the embryos while the parties were married, they would have to agree on that action. The trial court relied on parties' testimony in making its determination. The court questioned Sarah on this topic:

> *THE COURT*: Is it your understanding or assumption that to go forward assuming you're still married, you both have to be on board?
>
> *THE WITNESS*: Yes.
>
> *THE COURT*: Okay. Otherwise, they would not assist you if both were not on board? If you don't know, that's fine.
>
> *THE WITNESS*: I've never, I've never been presented so I can't hundred percent --
>
> *THE COURT*: Okay. That's fine.

Thus, while not 100% certain, Sarah was under the impression that both she and David generally needed to mutually agree on actions related to any embryos. David testified that he had a similar understanding.

Sarah on appeal argues that her (and necessarily David's) opinions are irrelevant because the answer to the court's question is a matter of contract interpretation, which is a question of law. Although it seems clear from the agreement that the parties needed to mutually agree to start the IVF process,[11] it is not clear from the language used in the various documents if one of the parties could unilaterally make decisions affecting the embryo. The document shows that the parties agreed to store all viable embryos. But immediately after that section, the agreement states:

> 1. At any time you may change your decision in regards to keeping the cryopreserved embryos, you have the following options:
>
> a. Anonymously donate embryos for a recipient couple to achieve pregnancy.
>
> b. Cell culture and degeneration: embryos will be thawed and kept under cell culture conditions until growth cease and the embryo degenerates. Embryos will then be disposed of according to professional ethical standards.
>
> c. Transfer embryos to another IVF program that I/we have designated and requested.
>
> d. Donate embryos to an embryo donation center which I/we select.
>
> e. Donate embryos for training of laboratory personnel[.]

Notably, the agreement does not clarify who the "you" is in the phrase "[a]t any time *you* may change your decision." (Emphasis added.) More specifically, the agreement does not directly address whether the term "you" is to be read as singular or plural, such that the mutual consent of both parties is required or whether only one of the parties can effectuate a change. But viewed as a whole, the only reasonable interpretation is that it requires mutual consent, especially where Sarah and David were both parties to the agreement. For instance, if one of the parties wanted to keep the embryo in storage and the other party wanted it disposed, it would be *impossible* for the storage facility to satisfy both requests. Therefore, although the contract says that "you may change your decision in regards to keeping the cryopreserved embryos," because Sarah and David were both parties to the agreement and because of the impossibility in satisfying disparate requests, the "you" should be understood as meaning the plural "you," meaning Sarah and David

---

[11] The admitted exhibit has many different documents that for the most part contain the approvals of both Sarah and David. The notable exceptions include the storage facility only requiring David's authorization to have his cryopreserved semen thawed and disposed of, the Michigan Department of Community Health only requiring Sarah's consent for her to be tested for HIV, and the IVF facility only requiring Sarah's consent for the use of fertility drugs.

collectively. Therefore, the trial court did not err by concluding that one party could not unilaterally make certain decisions regarding the frozen embryos.

Sarah further generally avers that the trial court erred when it found that most of the *Sparks* factors were either irrelevant or neutral. The *Sparks* factors that are to be considered when dividing marital property "whenever they are relevant" include:

> (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. [*Sparks*, 440 Mich at 159-160.]

However, these factors are not exclusive; "[t]here may even be additional factors that are relevant to a particular case." *Id*. at 160.

Sarah contends that, within these *Sparks* factors, the court failed to properly weigh that she has been paying for the storage of the embryo since the divorce and that she was "the overwhelming primary contributor" to the embryo, "putting herself through the several different medical procedures." We disagree. First, the court never found that Sarah paid for the storage of the embryo. The only evidence on this topic was David's testimony in which he said that the storage costs were approximately $600 or $700 a year, which he denied paying since the divorce. He therefore "assumed" that Sarah had been making the payments. While that may be a logical conclusion, it cannot be discounted that someone else, like Sarah's sister who contributed the egg, was paying for it. Even if Sarah had been paying for the storage of the embryo, however, that would not be particularly significant in light of other factors such as the potential birth of a child and the significant ramifications arising from that birth.

Sarah also contends that the trial court failed to give weight to the fact that she "was the primary contributor" to the embryo, "putting herself through the several different medical procedures." Although Sarah undoubtedly underwent many medical procedures, the embryo at issue was not created as a result of any of those procedures. The embryo was created by taking an egg from Sarah's sister, which was then fertilized by sperm from David. Although Sarah nobly went through various procedures during the entire IVF processes, those resulted in three children being born and were not directly related to the creation of the embryo at issue in this case.

We find that the trial court did not clearly err by finding that the *Sparks* factors generally, and specifically Factor (2), were neutral.

Sarah next argues that the trial court made other errors when considering the other balancing factors identified by this Court in *Markiewicz*. Specifically, Sarah contends that while it was proper for the court to consider that only David contributed genetically to the embryo, the court failed to consider that Sarah contributed to the embryo in terms of procedures, costs, and family lineage (with the egg being from her sister). We disagree. The court implicitly recognized this when it noted that Sarah's sister contributed the egg, which became the embryo. However, the court also recognized that between the two parties, only David contributed genetically to the embryo. The court further noted that Sarah was not foreclosed from having more children through

-12-

other egg donors. Although the court did not opine on whether she could still utilize eggs from her sister, the record does not indicate that would not be possible.

Sarah also claims that the trial court "dismissed" the fact that she offered to absolve David from any financial obligations related to a child born from the embryo. Contrary to Sarah's assertion, the court plainly recognized that Sarah offered to do so, but the court sided with David in the overall balancing.

The trial court appreciated the special characteristic of the embryo to produce a human life, but ultimately sided with David because it would be more inequitable to have Sarah birth a child with David's DNA against his wishes, as opposed to the inequity Sarah would suffer by being precluded from birthing a child that does not share her DNA. Simply put, given the circumstances of this case, the outcome derived by the trial court was a principled decision, and we are not left with a firm conviction that awarding the embryo to David was inequitable. *Sparks*, 440 Mich at 152.

Sarah also argues that the trial court erred by failing to consider her religious beliefs that the embryo is a human life. We disagree. Sarah did not present her religious beliefs during the evidentiary hearing. The trial court necessarily did not err by failing to consider evidence that was never presented. In fact, Sarah acknowledges on appeal that she only presented her religious views in her motion for reconsideration. Because she raised this issue for the first time in a motion for reconsideration, the argument is not preserved. See *Dep't of Environmental Quality v Morley*, 314 Mich App 306, 316; 885 NW2d 892 (2015) (citation omitted), where this Court concluded that "[b]ecause [this issue was raised] for the first time in a motion for reconsideration, the argument is not preserved." We will generally decline to address an unpreserved issue unless the failure to do so would result in manifest injustice, if the issue involves a question of law and the facts necessary for its resolution have been presented, or resolving the issue is necessary to properly determine the case. *Miller v Mich Dep't of Corrections*, __ Mich App __, __; __ NW2d __, (2022) (Docket No. 356430); slip op at 7. Our Supreme Court has cautioned that this discretion should be exercised sparingly and only in exceptional circumstances. *Napier v Jacobs*, 429 Mich 222, 233-234, 414 NW2d 862 (1987). No such exceptional circumstances exist here. Sarah had an opportunity to present evidence of her religious beliefs at the evidentiary hearing, yet failed to do so. We therefore consider this issue waived.

## IV. CHALLENGE TO THE JANUARY 2023 ORDER

Sarah further argues that the trial court erred by entering the January 2023 order in two respects. She first claims that, pursuant to MCR 7.208(A),[12] the order is void because it

---

[12] MCR 7.208(A) provides, in pertinent part:

> After a claim of appeal is filed or leave to appeal is granted, the trial court or tribunal may not set aside or amend the judgment or order appealed from except
>
> (1) by order of the Court of Appeals,

impermissibly modified the October 2022 order that already had been appealed to this Court. She also asserts that the trial court erred by not considering the parties' rights to reproductive freedom under the recently adopted Constitutional amendment, Const 1963, art 1, § 28, which was in effect at the time that the January 2023 order was entered.

"A court is, at all times, required to question sua sponte its own jurisdiction." *Tyrell v Univ of Mich*, 335 Mich App 254, 260; 966 NW2d 219 (2020), overruled on other grounds *Christie v Wayne State Univ*, ___ Mich ___; ___ NW2d ___ (2023) (Docket No. 162706); see also *Adams v Adams (On Reconsideration)*, 276 Mich App 704, 709; 742 NW2d 399 (2007).

This Court lacks jurisdiction to address this particular issue. The order was entered in January 2023, which was after she filed her December 7, 2022 claim of appeal from the October 2022 final order awarding the embryo to David. " '[A] party claiming an appeal of right from a final order is free to raise issues on appeal related to *prior* orders.' " *Green v Ziegelman*, 282 Mich App 292, 301 n 6; 767 NW2d 660 (2009) (citation omitted; emphasis added; alteration in original). But an appeal of a final order "does not bring before the reviewing court any subsequent orders." *Gracey v Grosse Pointe Farms Clerk*, 182 Mich App 193, 197; 452 NW2d 471 (1989). Therefore, we are without jurisdiction to consider Sarah's claims of error pertaining to the January 2023 order and decline to address her arguments.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Sima G. Patel

---

(2) by stipulation of the parties,

(3) after a decision on the merits in an action in which a preliminary injunction was granted, or

(4) as otherwise provided by law.